## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **POWER FORWARD COMMUNITIES, INC.,** **on behalf of itself and certain of its award subrecipients,** 11000 Broken Land Pkwy, Columbia, Maryland 21044, | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-762 |
| **CITIBANK, N.A.,** 5800 South Corporate Place Sioux Falls, South Dakota 57108, | |
| and | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** 1200 Pennsylvania Avenue, N.W. Washington, D.C. 20460, | |
| and | |
| **LEE ZELDIN, in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** 1200 Pennsylvania Avenue, N.W. Washington, D.C. 20460, | |
| and | |
| **WILLIAM CHARLES MCINTOSH, in his official capacity as ACTING DEPUTY ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** 1200 Pennsylvania Avenue, N.W. Washington, D.C. 20460, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Power Forward Communities, Inc. ("PFC"), on behalf of itself and certain of its

award subrecipients, files this Complaint against Defendants Citibank, N.A. ("Citibank"), the

United States Environmental Protection Agency ("EPA"), Lee Zeldin, in his official capacity as Administrator of EPA, and William Charles (W.C.) McIntosh, in his official capacity as Acting Deputy Administrator of EPA (together with EPA and Mr. Zeldin, "EPA Defendants"), and alleges as follows:

## INTRODUCTION

1.     This action challenges EPA's lawless attempt to terminate Plaintiff PFC's award under the National Clean Investment Fund and Citibank's wrongful suspension of accounts containing federal grant funds to which Plaintiff PFC is legally entitled.

2.     In 2022, Congress enacted and President Biden signed into law the Inflation Reduction Act of 2022 ("IRA").  Pub. L. No. 117-169.  The IRA amended the Clean Air Act to authorize EPA to establish the Greenhouse Gas Reduction Fund ("GGRF"), a "historic $27 billion investment to combat the climate crisis by mobilizing financing and private capital for greenhouse gas- and air pollution-reducing projects in communities across the country." *About the Greenhouse Gas Reduction Fund*, Environmental Protection Agency, https://www.epa.gov/greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund; *see also* 42 U.S.C. § 7434.  Pursuant to this mandate, EPA created and funded three GGRF programs: The National Clean Investment Fund ("NCIF"), the Clean Communities Investment Accelerator ("CCIA"), and Solar for All ("SFA").  EPA funded each program from appropriations made in the IRA: $14 billion for NCIF, $6 billion for CCIA, and $7 billion for SFA.

3.     PFC, a coalition of leading non-profit organizations, is the prime recipient of a $2 billion award under the NCIF program.  Announced in April 2024, PFC's award will finance clean, affordable family housing in cities, towns, rural areas, and Tribal communities across the country. These efforts—to provide families with affordable housing and lower families' utility bills, create

jobs, and improve community health and safety—have already begun, with PFC announcing an investment of more than $500 million to expand and preserve affordable housing, improve air quality, and create well-paying jobs in rural areas and communities across the nation.

4.      Under the terms of PFC's Award Agreement with EPA, the grant funds of PFC and its award subrecipients (PFC's coalition members and their affiliates) are held at Citibank, the "financial agent" selected by the U.S. Department of the Treasury to administer NCIF awards.

5.      An Account Control Agreement among Citibank, PFC, and EPA, and second-tier Account Control Agreements among Citibank, PFC, and each subrecipient (together, "the ACAs" or "the contracts") recognize that PFC and its subrecipients are the beneficial owners of the Citibank accounts at issue.  Pursuant to the ACAs, Citibank is obligated to perform the "administrative or ministerial" task of releasing funds upon receipt of a transfer instruction from PFC or a subrecipient.

6.      Citibank did so until February 13, 2025, roughly three weeks after President Trump took office for the second time and—just hours into his second term—issued Executive Order 14154, *Unleashing American Energy* ("the Energy EO").  Section 7 of the Energy EO, titled "Terminating the Green New Deal," states that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022."  The following day, January 21, 2025, the White House Office of Management and Budget ("OMB") issued memorandum M-25-11, which repeats the Energy EO's "directive" to executive agencies to "immediately pause disbursements of [IRA] funds," including "funds supporting programs, projects or activities … supporting the 'Green New Deal.'"  On January 27, 2025, OMB issued memorandum M-25-13, instructing federal agencies to pause "all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be

implicated by the executive orders, including, but not limited to, financial assistance for … the green new deal." Although OMB promptly rescinded memorandum M-25-13, the funding freeze directive remained in place. *See* @PressSec, Karoline Leavitt, Twitter (Jan. 29, 2025, 1:40 PM) ("This is NOT a rescission of the federal funding freeze. It is simply a rescission of the OMB memo.").

7.    Multiple federal district courts have since enjoined the funding freeze ordered by the Energy EO, OMB memorandum M-25-11, and OMB memorandum M-25-13. *See* Memorandum Opinion (ECF No. 51), Order (ECF No. 52), *Nat'l Council of Nonprofits v. Trump*, No. 1:25-cv-00239 (D.D.C. Feb. 25, 2025); Memorandum and Order (ECF No. 161), *State of New York v. Trump*, No. 1:25-cv-00039 (D.R.I. Mar. 6, 2025).

8.    On February 12, 2025, the newly confirmed EPA Administrator, Lee Zeldin, publicly criticized the NCIF program and its award recipients. Mr. Zeldin demanded that NCIF grant funds—despite having been contractually obligated and disbursed—be "immediately return[ed]" to the government. He also vowed, without any specific basis for adverse action, that he would "refer[] this matter to the Inspector General's Office and [] work with the Justice Department." Mr. Zeldin subsequently acted on those promises and continued to disparage the NCIF program and its award recipients.

9.    The next day, on February 13, 2025, Citibank froze PFC's and its subrecipients' funds. The bank briefly lifted that freeze to process payments on February 14, 2025, but Citibank has refused PFC's and its subrecipients' disbursement instructions ever since.

10.    Citibank has not received a court order or other legal process authorizing it to suspend the accounts at issue. Indeed, PFC understands from public media reports that, despite multiple attempts by political appointees at EPA and the Department of Justice ("DOJ") to obtain

such authority, the federal government has been unable to do so, owing, apparently, to the absence of any indicia of impropriety.  An EPA spokesperson thus stated on March 4, 2025, that "[a]ny freeze on [NCIF] funds is at the discretion of Citibank."  In a court filing on March 12, 2025, Citibank represented that its freeze of NCIF funds was in response to "recommendation[s]" and instructions from several federal agencies.

11.    On March 11, 2025, EPA sent all NCIF and CCIA award recipients—including PFC—an asserted "Notice of Grant Termination" ("the Notice").  The Notice, which states that it is "effective immediately," relies on purported "concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." The Notice does not identify a single example of any such misconduct on the part of any NCIF or CCIA grantee—let alone PFC.

12.    NCIF awards, including PFC's, may be unilaterally terminated by the government only in limited circumstances, and the Notice satisfies none of them.  It cites no violation of any applicable law, regulation, or award term; it alleges no misrepresentation by PFC (or any other awardee); and it identifies no "Waste, Fraud, or Abuse" as defined in EPA's General Terms and Conditions.  EPA's purported termination of PFC's NCIF award—indeed, of the entirety of the NCIF and CCIA programs—is thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the Administrative Procedure Act.  5 U.S.C. § 706(2)(A).

13.    EPA's conduct also contravenes the United States Constitution.  By terminating PFC's award without lawful basis and in disregard of Congress's legislative enactments, the agency has violated the Fifth Amendment's Due Process Clause and the Constitution's Separation of Powers.

14. Citibank's conduct is likewise unlawful. Citibank has received no legal process that justifies the freeze of PFC's and its subrecipients' funds. And by the plain terms of the ACAs, Citibank lacks any discretion to freeze the accounts of PFC or its subrecipients. Citibank has therefore breached the ACA and wrongfully withheld the grant funds that PFC and its subrecipients have an immediate legal right to possess.

15. Defendants' actions have caused and continue to cause real and immediate harm. EPA's unlawful purported termination of the NCIF program and Citibank's freezing of PFC's and its subrecipients' accounts threaten PFC's very existence. PFC has no committed source of funding to replace the grant funds, without which it cannot pay its existing employees (let alone hire the additional staff necessary to implement its workplan), pay its critical service providers and contractors, or keep pace with the requirements of its NCIF workplan. Without access to their grant funds, PFC and its subrecipients will be unable to meet their obligations under the NCIF program or their commitments to American families to lower energy costs and improve the health, safety, and affordability of housing across the nation. Without access to the NCIF funds, the subrecipients are not able to move forward with the projects they committed to undertake. This will have an immediate, direct, and devastating impact on the organizations' constituents, who will be unable to access affordable housing, affordable heating and cooling systems, and other essential services.

16. PFC therefore brings this lawsuit on behalf of itself and certain of its subrecipients to obtain declarations that EPA has violated the Constitution and the APA, and that Citibank is in breach of the ACA and subrecipient ACAs; and to enjoin Defendants' illegal conduct and promptly restore PFC's and its subrecipients' NCIF funds.

**PARTIES**

17.     Defendant EPA is the agency of the federal government of the United States charged with administering the GGRF and NCIF program.  EPA is an agency within the meaning of the APA.

18.     Defendant Lee Zeldin is the Administrator of EPA and the agency's highest-ranking official.  PFC sues Mr. Zeldin in his official capacity.

19.     Defendant William Charles McIntosh is the Acting Deputy Administrator of EPA and the agency's second highest-ranking official.  PFC sues Mr. McIntosh in his official capacity.

20.     Defendant Citibank is a national banking association organized and existing under the laws of the United States of America, with headquarters in South Dakota.  It is the wholly owned subsidiary of Citigroup, Inc., headquartered in New York.

21.     Plaintiff PFC is a Delaware non-stock, not-for-profit corporation with its principal place of business in Columbia, Maryland.  PFC, as described by EPA, is a nonprofit coalition of "the country's most trusted housing, climate, and community investment groups that is dedicated to decarbonizing and transforming American housing to save homeowners and renters money, reinvest in communities, and tackle the climate crisis."   PFC aims to expand and preserve affordable housing, improve air quality, and create well-paying jobs by ramping up simple energy-efficiency and other improvements in single-family and multifamily homes nationwide.  PFC's coalition members and/or their affiliates, including Enterprise Community Partners, Inc. (Enterprise Green Accelerator, Inc.), Local Initiatives Support Corporation (LISC Green LLC), and Rewiring America, Inc. (Rewiring Community Investment Fund, Inc.), are designated subrecipients of the grant funds awarded to PFC, and in this role are obligated to implement certain objectives of the grant (collectively, the "Subrecipients").

## JURISDICTION AND VENUE

22.    PFC brings this action for declaratory and injunctive relief based on EPA Defendants' violation of the APA and United States Constitution, and Citibank's breach of contract and conversion.

23.    This Court has jurisdiction over PFC's claims against EPA Defendants under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

24.    This Court has jurisdiction over PFC's claims against Citibank under 28 U.S.C. § 1367, because those claims are so related to PFC's claims against EPA Defendants that they form part of the same case or controversy.[1]

25.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(e) because EPA Defendants are located in this District and a substantial part of the acts or omissions giving rise to the claim occurred in this District.

## STANDING

26.    Plaintiff PFC has standing to bring this action on behalf of itself and the Subrecipients, including Enterprise Community Partners, Inc. (Enterprise Green Accelerator, Inc.), Local Initiatives Support Corporation (LISC Green LLC), and Rewiring America, Inc. (Rewiring Community Investment Fund, Inc.).

27.    As detailed in paragraphs 61-72, each of the Subrecipients is a party to an ACA with Citibank and PFC, and each Subrecipient has been harmed by Citibank's refusal to disburse

---

[1] Even if EPA were not named as a defendant, the Court would have jurisdiction over PFC's claims against Citibank under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

funds. Each Subrecipient therefore has standing to challenge Citibank's breach of its contractual obligations and refusal to release funds.

28.  As detailed in paragraphs 31-49, each of the Subrecipients is a subrecipient of funds under PFC's NCIF award, and each Subrecipient has been harmed by EPA's purported termination of PFC's NCIF Award Agreement. Each Subrecipient therefore has standing to challenge EPA's purported termination of the Award Agreement.

29.  Citibank's violations of PFC's and the Subrecipients' contractual and property rights, and EPA Defendants' unlawful purported termination of the Award Agreement, prevent PFC and its Subrecipients from decarbonizing and transforming American housing, reinvesting in communities, and tackling the climate crisis—efforts that go to the very core of PFC's mission. Accordingly, the interests PFC seeks to protect through this lawsuit are germane to PFC's purpose.

30.  Because this Complaint seeks only declaratory and injunctive relief based on constitutional, statutory, contractual, and property rights that are substantively identical as to PFC and all Subrecipients, adjudicating this lawsuit does not require the participation of the individual Subrecipients.

## FACTUAL BACKGROUND

### I.  PFC's Award Agreement under the National Clean Investment Fund

31.  In 2022, Congress enacted and President Biden signed into law the IRA. Among other components, the IRA amended the Clean Air Act to authorize EPA to make competitive grants under the Greenhouse Gas Reduction Fund ("GGRF") to provide financial assistance for "the rapid deployment of low- and zero-emission products, technologies, and services." 42 U.S.C. § 7434(c)(1).

32.    To implement the IRA's requirements, EPA created the National Clean Investment Fund ("NCIF"), the Clean Communities Investment Accelerator ("CCIA"), and Solar for All ("SFA").    EPA funded the NCIF program with approximately $14 billion appropriated by Congress—$11,970,000,000.00 under 42 U.S.C. § 7434(a)(2) (for grants "providing financial assistance and technical assistance" for projects, activities, and technologies that reduce or avoid greenhouse gas emissions and other forms of air pollution) and another $2,000,000,000.00 under 42 U.S.C. § 7434(a)(3) (out of $8,000,000,000.00 for grants "providing financial assistance and technical assistance in low-income and disadvantaged communities" for the same purposes). Congress instructed that these funds remain available to be awarded until September 30, 2024.

33.    On July 14, 2023, EPA released the Notice of Funding Opportunity ("NOFO") No. EPA-R-HQ-NCIF-23 announcing a public competition for the NCIF grant funds.  The NOFO was updated on August 11, 2023 to list additional categories of projects deemed qualified to receive an award.  *See* Exhibit A.

34.    Among other things, the NOFO explained that the "competition will provide grants to 2–3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector to provide accessible, affordable financing for tens of thousands of clean technology projects nationwide."  Exhibit A at 4.  Both individual and coalition applicants were eligible to receive an award.  *Id.* at 21.  The NOFO described coalition applicants as "composed of one lead applicant, which partners with one or more non-lead coalition members that are named in the application and would receive subawards (in the form of subgrants) to carry out a portion of the grant's activities if the application is selected."  *Id.* at 6.  If a coalition is selected for an award, the NOFO explained, "the lead applicant will become the grantee, administer the grant as a pass-through entity for the purposes of 2 CFR Part 200 and the EPA

Subaward Policy, and be accountable to EPA for effectively carrying out the full scope of work and the proper financial management of the grant (including subawards to non-lead coalition members)."  *Id.* at 7.

35.    The NOFO "included a robust set of application requirements and corresponding evaluation criteria that were used to assess materials submitted to meet those application requirements."  In addition, "[a]pplication requirements covered a diverse set of topics and included not just a detailed project narrative but also a robust set of application attachments."  *See* EPA, Greenhouse Gas Reduction Fund, Review and Selection Process (last updated Aug. 16, 2024)[2]; *see also generally* Exhibit A.

36.    The NOFO also contemplated "financial agent arrangements with U.S. Department of Treasury" to "ensure that EPA's interests are protected" with respect to drawdown requirements.  Exhibit A at 56.

37.    In response to the NOFO, PFC submitted its application on or about October 12, 2023.  So did dozens of other applicants.  EPA then engaged in a rigorous, multi-stage review and selection process involving nearly 50 federal employees across multiple agencies.

38.    On April 4, 2024, EPA announced that it had selected three awardees for the NCIF program:  PFC, which would receive a $2 billion award; Climate United Fund ("CU"), which would receive a $6.97 billion award; and Coalition for Green Capital ("CGC"), which would receive a $5 billion award.  Per the EPA's press release, with these funds, each awardee would help "deliver accessible, affordable financing for clean technology projects nationwide, partnering with private-sector investors, developers, community organizations, and others to deploy projects,

---

[2] Available at:  https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process.

mobilize private capital at scale, and enable millions of Americans to benefit from the program through energy bill savings, cleaner air, job creation, and more."  Press Release, EPA, Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America (Apr. 4, 2024).[3]

39.    PFC developed, and EPA approved, a workplan consistent with the aims of the Inflation Reduction Act, under which Congress appropriated the NCIF funds.  As described in PFC's workplan, the initial version of which is publicly available on EPA's website,[4] the PFC coalition will commit approximately 62% of its investments, or $777 million of the award, to net-zero emissions buildings projects.  Approximately 8% of PFC investments, or $106 million of the award, will focus solely on distributed energy generation and storage (though many of PFC's net-zero emissions buildings projects will also involve distributed energy components).  The remaining approximately 30% of PFC investments, or roughly $376 million of the award, will be used to finance rehabilitation and new construction of single-family and multifamily qualified projects in low-income and disadvantaged communities.  Consistent with the terms of its Award Agreement, PFC will deploy approximately 86% of its investments ($1.09 billion) in low-income and disadvantaged communities, approximately 15% ($185 million) in rural communities, and approximately 2% ($24 million) in Tribal communities.

40.    On August 8, 2024, PFC and EPA entered into an Award Agreement with respect to PFC's $2 billion NCIF award, Exhibit B, which was subsequently amended on December 20,

---

[3] Available at:  https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and.

[4] NCIF Workplan – Power Forward Communities, Inc., available at https://www.epa.gov/system/files/documents/2024-08/ncif-workplan-pfc.pdf (last visited March 11, 2025).

2024 (as amended, the "Award Agreement"), Exhibit C.  The Award Agreement recognizes PFC's $2 billion award and sets forth the terms and conditions of the grant.

41.     The Award Agreement, both as originally executed in August 2024 and as amended, expressly contemplates that the award would be administered by a "Financial Agent." Exhibit C, Sections III.AG, V.  A Financial Agent is defined to mean a "depository institution [] designated as a financial agent of the United States."  *Id.*  PFC was required to "set up and utilize an Account or Accounts at the Financial Agent."  *Id.* at Section III.AG.

42.     Once the "Deposit Account" was established at the Financial Agent, EPA and PFC agreed that PFC was to drawdown the entire award ($2 billion) from the Treasury's Automated Standard Application Payments ("ASAP") system.  Exhibit C, Section V.A.3.  The Deposit Account, not the ASAP system, would then be used as PFC's "operating account for the award." *Id.*

43.     EPA has complete, real-time view access into all of the Citibank accounts established for PFC and its Subrecipients—meaning that the financial agent arrangement provides significantly greater transparency than the ASAP system.  ASAP permits EPA to see only a running total of grant funds disbursed to a grant recipient, and not the activities of award subrecipients.

44.     Pursuant to the Award Agreement, the Deposit Account was to "consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations')."  Exhibit C, Section V.A.3.

   a. The Budget Account would hold the initial funds drawn from the ASAP account, and PFC would "direct the Financial Agent to allocate funds across

the various sub-accounts in the Budget Account in accordance with its workplan." *Id.* at Section V.A.3.1.

b.    The Reserve Account was "intended to enable funds to be set-aside within the Financial Agent for use for any form of Financial Assistance that requires the Recipient to pledge or legally commit." *Id.* at Section V.A.3.2.

c.    The Program Income from Operations Account would "enable Program Income from Operations … to be held, tracked, and segregated." *Id.* at Section V.A.3.3.

45.    The Department of the Treasury ultimately selected Citibank as the Financial Agent to administer NCIF grant funds, including those awarded to PFC.

46.    The federal government has long used financial agent arrangements to administer and disburse federal grant monies. Such agreements were first authorized in the 1860s and have been used regularly for decades.[5] As relevant here, the use of a financial agent was referenced in the EPA's NOFO released in July 2023 and described in the Award Agreement's terms and conditions. Exhibit A at 56; Exhibit C, Sections III.AG, V. PFC had no role in EPA's decision to include the Financial Agent concept in the NOFO. PFC also had no role in the selection of Citibank as the Financial Agent, which, on information and belief, was coordinated by EPA and the Treasury Department as part of a competitive process.

47.    The Award Agreement requires PFC to comply with rigorous reporting requirements, including that PFC shall submit quarterly, semi-annual, annual, and final reports to

_____

[5] *See* U.S. Government Accountability Office, Revenue Collections And Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency, GAO-17-176 (Jan. 2017), https://www.gao.gov/assets/gao-17-176.pdf ("Treasury has a long history of using financial agents to support its core functions of disbursing payments and collecting revenue.").

EPA "that contain detailed narratives describing program performance … supported with qualitative discussions and quantitative metrics."  Exhibit C, Section II.A.1.  In addition, PFC must satisfy financial audit requirements, which include the requirement that EPA shall "disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from [PFC's] grant program in the Subrecipient's fiscal year."  *Id.* at Section III.Z.

48.     Federal regulations providing general terms and conditions for award agreements provide limited bases for the agency's termination or suspension of award funds.  2 C.F.R. § 200.339 provides "remedies for noncompliance," including suspension or termination, only where "the recipient or subrecipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award," and even then, only if the agency "determines that noncompliance cannot be remedied by imposing specific conditions."  Similarly, 2 C.F.R. § 200.340 provides that an award may be terminated "[b]y the Federal agency" only if the recipient "fails to comply with the terms and conditions of the Federal award," § 200.340(a)(1), or otherwise "pursuant to the terms and conditions of the Federal award," § 200.340(a)(4).  The regulatory bases for termination thus incorporate by reference the bases for termination set forth in the Award Agreement.

49.     Those terms and conditions of the Award Agreement provide "only" three narrow circumstances in which EPA may terminate PFC's NCIF award.  Exhibit C, Section III.T.4.

    a.  First, EPA may terminate the Award Agreement if PFC engages in "substantial" noncompliance with the award's terms and conditions "such that effective performance of the [Award Agreement] is Materially Impaired."  *Id.*  Effective performance is "Materially Impaired" if: (1) EPA issues "a written determination

and finding … that [PFC] has failed to achieve sufficient progress in accordance with the Sufficient Progress clause" of the Award Agreement; and (2) "if EPA in its sole discretion determines that a corrective action plan" would remedy the issue, EPA must issue "a separate written determination and finding … that [PFC] has not materially addressed its failure." *Id.* at Section I.

b.  Second, EPA may terminate the Award Agreement if "there is adequate evidence of Waste, Fraud, or Abuse," which is defined in reference to EPA's General Terms and Conditions and 2 C.F.R. § 200.113.[6] *Id.* at Sections I, III.T.4.  Under those authorities, a finding of "Waste, Fraud, or Abuse" requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733." *Id.*

c.  Third, EPA may terminate the Award Agreement if PFC engages in "material misrepresentation of eligibility status."  Award Agreement, Section III.T.4.

## II.     PFC's Account Control Agreement

50.     On November 1, 2024, PFC, Citibank, and EPA executed the Account Control Agreement, which the parties amended on January 13, 2025 (as amended, the "ACA").  A copy of the ACA is attached hereto as Exhibit D.

51.     Pursuant to the ACA, Citibank "maintains the Accounts for [PFC]."  Exhibit D, Section 1(a).  Section 1(a) of the ACA provides that "all property (including, without limitation,

---

[6] EPA's General Terms and Conditions are available at:
https://www.epa.gov/system/files/documents/2024-
10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf.

all funds and financial assets) held by [Citibank] for the accounts of [PFC] are, and will continue to be, credited to the Accounts in accordance with instructions given by [PFC]." *Id.*

52.    Citibank agreed in the ACA to "comply with all instructions, notifications, and entitlement orders [it] receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts … originated by [PFC]." Exhibit D, Section 2.

53.    According to Section 6(a) of the ACA, Citibank's duties, responsibilities, and obligations under the ACA are "administrative or ministerial." Exhibit D, Section 6(a).

54.    The ACA recognizes one exception to the requirement that Citibank comply with PFC's disbursement instructions:  If Citibank "receives a notice, substantially in the form attached [to the ACA] as <u>Exhibit A</u> (a 'Notice of Exclusive Control') from [EPA] that [EPA] is exercising its right to exclusive control over an Account," Citibank may refuse to comply with PFC's instructions.  Exhibit D, Section 2.  In such a scenario, Citibank must "comply with all instructions, notifications, and entitlement orders [it] receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts … originated by … [EPA], without further consent by [PFC]." *Id.*

55.    Pursuant to the ACA, "the terms and conditions entitled 'Deposit Account at Financial Agent' in the [Award Agreement] indicate the conditions under which [EPA] may exercise its right of control." Exhibit D, Recitals.

56.    The Award Agreement's terms and conditions entitled "Deposit Account at Financial Agent" state:

Notwithstanding any other provision of this [Award] Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under an ACA when EPA issues a written determination and finding that [PFC] has **failed to comply with the terms and conditions of this [Award] Agreement, and that noncompliance is substantial such that effective performance of the [Award] Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status**, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the [Award] Agreement. The written determination and finding and a copy of the Notice of Exclusive Control shall be sent to [PFC] when the Notice of Exclusive Control is furnished to the Financial Agent. EPA and [PFC] have mutually agreed only to the specific process outlined in this term for furnishing a Notice of Exclusive Control instruction to the Financial Agent.

Exhibit C, Section V.A.3 (emphasis added).

57.     Thus, beyond having to initiate an award suspension or termination under 2 C.F.R. § 200.339, the standard for EPA to issue a Notice of Exclusive Control under the ACA mirrors precisely the termination standard set forth in the Award Agreement and incorporated into 2 C.F.R. § 200.340, *see supra* ¶¶ 48-49.

58.     EPA has not sent Citibank a Notice of Exclusive Control in connection with PFC's accounts.  Indeed, at the March 12, 2025 hearing on CU's motion for a temporary restraining order against Citibank, EPA, and Administrator Zeldin before a court in this district, Civil Action No. 1:25-cv-00698-TSC, counsel for EPA represented that EPA has not, and does not intend to, issue a Notice of Exclusive Control to Citibank in connection with any NCIF account.

59.     Nevertheless, the Department of the Treasury emailed Citibank on March 4, 2025, stating that EPA had "informed [Treasury] of their concerns regarding potential fraud and/or conflicts of interest related to [GGRF]."  Defendant Citibank, N.A.'s Opposition to Plaintiff Climate United Fund's Motion for Temporary Restraining Order, Ex. 7 (ECF No. 14), *Climate United Fund v. Citibank, N.A.*, No. 1:25-cv-00698 (D.D.C. Mar. 12, 2025) (hereinafter, "Citibank's Opposition to CU's Motion for TRO").  Treasury instructed Citibank "to work directly with the EPA to establish and implement reasonable account controls to serve the purposes and

interests of the United States." *Id.* It further "instruct[ed] Citibank not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025" to "provide the EPA with the necessary time to develop reasonable account controls." *Id.*

60. EPA emailed Citibank on March 10, 2025, instructing it to "pause the processing of payment instructions for the GGRF accounts until further notice." Citibank's Opposition to CU's Motion for TRO, Ex. 2.

## III.    The Subrecipients' Account Control Agreements

61. Consistent with the NOFO, the Award Agreement authorized PFC to issue subawards to carry out parts of its NCIF workplan and required PFC to enter into separate agreements with each Subrecipient, pursuant to which PFC would distribute funds received from its NCIF award.

62. On or about December 23, 2024, PFC entered into subaward agreements with each of the Subrecipients (collectively, the "Subaward Agreements"). Each Subaward Agreement incorporates by reference the Award Agreement (between PFC and EPA) and requires the Subrecipient to comply with all applicable terms and conditions under the Award Agreement, including specifically any applicable "Financial Agent Terms and Conditions." Subaward Agreements, Sections 1.3, 8.1, 9.1.

63. Pursuant to the Award Agreement, it is EPA's right to require PFC to "maintain[] a security interest on all award funds held by its Financial Assistance Subrecipients at the Financial Agent." Exhibit C, Section V, "Flow-Down Requirements of Deposit Account at Financial Agent." To secure this interest, on or about January 10, 2025, PFC, Citibank, and each Subrecipient entered into a separate, second-tier Account Control Agreement (a "Subrecipient ACA").

64.     These agreements are substantively identical to one another.  Copies of the Subrecipient ACAs are attached hereto as Exhibits E-G.

65.     Each Subrecipient ACA notes that the Subrecipient granted PFC a security interest in its accounts.  Exhibits E-G at Recitals.

66.     Pursuant to the Subrecipient ACAs, Citibank "maintains the Accounts for the [Subrecipients]," and, generally, "all property (including, without limitation, all funds and financial assets) held by [Citibank] for the accounts of the [Subrecipients] are, and will continue to be, credited to the Accounts in accordance with instructions given by the [Subrecipients]." Exhibits E-G at Section 1(a).

67.     Moreover, Citibank agreed to "comply with all instructions, notifications, and entitlement orders [it] receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts … originated by the [Subrecipients]."  Exhibits E-G at Section 2.

68.     As with the ACA among Citibank, PFC, and EPA, Citibank's duties, responsibilities and obligations under the Subrecipient ACAs are "administrative or ministerial." Exhibits E-G at Section 6(a).

69.     The Subrecipient ACAs recognize one exception to the requirement that Citibank comply with the Subrecipients' disbursement instructions:  If Citibank "receives a notice, substantially in the form attached [to the Subrecipient ACAs] as <u>Exhibit A</u> (a 'Notice of Exclusive Control') from [PFC] that [PFC] is exercising its right to exclusive control over an Account," Citibank may refuse to comply with the Subrecipients' instructions.  Exhibits E-G at Section 2.  In such a circumstance, Citibank must "comply with all instructions, notifications, and entitlement

orders [it] receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts … originated by … [PFC], without further consent by the [Subrecipients]." *Id.*

70.     Pursuant to the Subrecipient ACAs, "the terms and conditions in the Subaward Agreement indicate the conditions under which [PFC] may exercise its right of control." Exhibits E-G at Recitals.

71.     Any Notice of Exclusive Control, or any other notice to Citibank under the Subrecipient ACAs, is to be sent to Citibank's office in New York City, New York. Exhibits E-G at Section 13.

72.     PFC has not sent Citibank a Notice of Exclusive Control in connection with any Subrecipient account.

## IV.     The New Administration's Attempts to Freeze NCIF Funds

73.     On January 20, 2025, within hours of his inauguration, President Trump issued the Energy EO. Section 7 of the Energy EO, titled "Terminating the Green New Deal," states that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022."

74.     The following day, January 21, 2025, OMB issued memorandum M-25-11. That memorandum repeated the Energy EO's "directive" to executive agencies to "immediately pause disbursements of [IRA] funds," including "funds supporting programs, projects or activities … supporting the 'Green New Deal.'"

75.     OMB then issued, on January 27, 2025, memorandum M-25-13, directing federal agencies to pause "all activities related to obligation or disbursement of all Federal financial

assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to … the green new deal."

76.     Two lawsuits were filed the next day, on January 28, 2025, challenging the Administration's funding freeze.  Twenty-two states and the District of Columbia brought suit in the U.S. District Court for the District of Rhode Island, and a set of nonprofit plaintiffs brought suit in the U.S. District Court for the District of Columbia.   The same day, the district court in the nonprofits' case ordered an administrative stay of OMB memorandum M-25-13, pending a hearing on a motion for a temporary restraining order.  *See* Order of Administrative Stay (ECF No. 13), *Nat'l Council of Nonprofits v. Trump*, No. 1:25-cv-00239 (D.D.C. Jan. 28, 2025).

77.     After the U.S. District Court for the District of Columbia issued the administrative stay, OMB rescinded memorandum M-25-13.   The White House Press Secretary, however, announced that the action was "simply a rescission of the OMB memo" and "NOT a rescission of the federal funding freeze."  *See* @PressSec, Karoline Leavitt, Twitter (Jan. 29, 2025, 1:40 PM).

78.     On January 31, 2025, the U.S. District Court for the District of Rhode Island issued a temporary restraining order enjoining the funding freeze.  Temporary Restraining Order (ECF No. 50), *State of New York v. Trump*, No. 1:25-cv-00039 (D.R.I. Jan. 31, 2025).  Subsequently, the court issued a preliminary injunction enjoining the Administration from implementing the funding freeze as directed in the Energy EO, OMB memorandum M-25-11, OMB memorandum M-25-13, "or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress."  Memorandum and Order (ECF No. 161), *State of New York v. Trump*, No. 1:25-cv-00039 (D.R.I. Mar. 6, 2025).

79.     Additionally, on February 3, 2025, the U.S. District Court for the District of Columbia issued a temporary restraining order enjoining the funding freeze.  Memorandum Opinion and Order (ECF No. 30), *Nat'l Council of Nonprofits v. Trump*, No. 1:25-cv-00239 (D.D.C. Feb. 3, 2025).   On February 25, 2025, the court then issued a preliminary injunction to enjoin OMB memorandum M-25-13.  Memorandum Opinion (ECF No. 51), Order (ECF No. 52), *Nat'l Council of Nonprofits v. Trump*, No. 1:25-cv-00239 (D.D.C. Feb. 25, 2025).

## V.    Citibank Freeze of PFC's and the Subrecipients' Accounts

80.     Prior to February 12, 2025, PFC and its coalition members routinely submitted instructions to Citibank to disburse funds pursuant to each entity's respective ACA.  Citibank promptly complied with each of those instructions.

81.     On February 12 and/or 13, 2025, PFC submitted instructions to Citibank to disburse funds in accordance with the terms of the ACAs.

82.     Unlike instructions submitted prior to that date, Citibank did not timely disburse funds or otherwise respond to PFC's February 12 and 13, 2025 transfer instructions.

83.     On February 14, 2025, having not received a response from Citibank, PFC—together with the other NCIF awardees—sent a letter to Citibank.  PFC, CU, and CGC stated that it was their "understanding … that [EPA] ha[d] not provided a Notice of Exclusive Control as provided for under the ACA, nor [was] there any basis to do so, and the respective ACAs remain in full force and effect and binding upon all parties thereto."

84.     PFC, CU, and CGC continued:

Under these circumstances, [Citibank's] apparent and ongoing refusal to comply with valid disbursement instructions is an active and continuing breach of its obligations under the ACA. This breach has caused and continues to cause significant harm to [PFC, CU, and CGC] that will be difficult to remedy. [PFC, CU, and CGC] cannot pay due invoices, close committed transactions, or fulfill other obligations under their respective Grant Agreements (as defined and identified in the ACAs) with [EPA].

85.    Lastly, PFC, CU, and CGC "demand[ed] that [Citibank] comply with its obligations under the ACAs and immediately disburse [PFC's, CU's, and CGC's] funds in accordance with their instructions to date, and continue to do so as instructed pursuant to the terms of the ACAs." PFC, CU, and CGC further requested that, in the event Citibank were to refuse to comply, it provide "immediate notice and information in writing regarding the basis for such declination."

86.    Citibank did not respond to the February 14, 2025 letter.

87.    Also on February 14, 2025, PFC submitted two transfer instructions to Citibank: one at 10:29 AM and a second at 4:14 PM.

88.    Citibank disbursed funds in response to the 10:29 AM instruction that same day, as well as in response to the then-pending February 12 and/or February 13 instructions.  To date, however, Citibank has not disbursed funds in response to the 4:14 PM instruction.

89.    Since February 14, 2025, PFC and certain Subrecipients have submitted additional instructions to Citibank to disburse funds in accordance with the ACAs, including on February 14, March 9, and March 10.

90.    Citibank has failed to disburse funds in response to these instructions and has otherwise ignored the transfer instructions.

91.    On February 19, 2025, PFC, CU, and CGC again contacted Citibank regarding its refusal to honor the entities' disbursement instructions.  The correspondence "not[ed] that each of the prime NCIF recipients ha[d] funding requests from Friday 2/14 and Tuesday 2/18, which [were] pending [and] which ha[d] not been disbursed by Citi" and that "[c]ertain subgrantees also ha[d] requested funds which ha[d] not been disbursed."  PFC, CU, and CGC again requested that Citibank "provide the legal basis for [its conduct] or confirm whether it received … a request or … updated guidance from the EPA … or any other governmental agency."

92.     Citibank did not respond to the February 19, 2025 email.

93.     On March 1, 2025, PFC sent another letter to Citibank "to request that Citibank comply with PFC's transfer instructions with respect to its accounts … so that PFC can continue with its important mission" and "[to] request a meeting as soon as possible to discuss [the] urgent matters."

94.     PFC explained in its letter that Citibank was contractually obligated to carry out PFC's transfer instructions.  PFC noted that "[t]he ACA contemplates only one scenario under which Citibank may be authorized to deviate from those obligations," i.e., "when it receives a 'Notice of Exclusive Control' from EPA," and "[t]o PFC's knowledge, EPA has not issued such a notice[,] [n]or could EPA do so."

95.     PFC reiterated that "[b]ecause of Citibank's failure to adhere to its obligations under the ACA, PFC and its subgrantees face financial shortfalls that imperil their ability to retain employees, deliver on the projects for which the funds are allocated and which they are legally obligated to perform, and meet their other legal obligations."

96.     As of the date of this Complaint, Citibank has not responded to PFC's March 1, 2025 letter.  Nor has Citibank complied with the disbursement instructions of PFC or any Subrecipient since February 14, 2025.

97.     In response to a lawsuit filed by another NCIF award recipient, Citibank stated: "Citi has been working with the federal government in its efforts to address government officials' concerns regarding this federal grant program.  Our role as financial agent does not involve any

discretion over which organizations receive grant funds.  Citi will of course comply with any judicial decision."[7]

## VI.    Citibank Has No Lawful Justification for Freezing the Accounts

98.    As noted in paragraphs 50-72, the ACAs prohibit Citibank from refusing to fulfill a transfer instruction unless and until it receives a "Notice of Exclusive Control."

99.    Citibank has not received a Notice of Exclusive Control.

100.    Based on public news reports, as well as Citibank's Opposition to CU's Motion for a Temporary Restraining Order, filed in Civil Action No. 1:25-cv-00698, it appears that Citibank has instead frozen PFC's and its Subrecipients' accounts at the arbitrary urging of the new political administration.  But although the new administration has repeatedly disparaged the NCIF program and PFC in recent weeks, it has not obtained a court order or any other legal process that would justify Citibank's freeze.

101.    Two weeks into his tenure as EPA Administrator, Lee Zeldin took to the online platform X to announce EPA's intent to claw back the NCIF grant funds.  Mr. Zeldin demanded that "the Bank must immediately return" the funds.  He also vowed, without any specific basis for adverse action, that he would "refer[] this matter to the Inspector General's Office and [] work with the Justice Department."  EPA is "not going to rest," he pledged, until it has "recovered" the grant funds.

102.    On February 23, 2025, Mr. Zeldin appeared on a national Fox News morning show to discuss the NCIF program.  Mr. Zeldin claimed, without basis, that the program is tainted by conflicts of interest and disparaged PFC based on alleged ties to a former democratic politician.

---

[7] Claire Brown, *Climate Nonprofit Sues E.P.A. Over Billions in Frozen Funds*, N.Y. Times, March 10, 2025, available at https://www.nytimes.com/2025/03/08/climate/epa-climate-funds-lawsuit.html.

103.    Mr. Zeldin made attacks on another national Fox News program on March 6, 2025, calling the NCIF program a "green slush fund" and criticizing the existence of the Account Control Agreements with Citibank.

104.    Despite Mr. Zeldin's public statements, EPA has not obtained a court order or other legal process that authorizes Citibank to freeze the funds.  To the contrary, an EPA spokesperson stated on March 4, 2025 that "[a]ny freeze on [NCIF] funds is at the discretion of Citibank."

105.    The new political administration has also turned to the criminal justice system in its attempt to find a basis to withhold PFC's funding.  As with EPA's criticisms, however, none of these efforts justifies Citibank's failure to comply with the ACAs.

106.    As detailed in her February 18, 2025 resignation letter (attached hereto as Exhibit H), on February 17, 2025, Denise Cheung, the head of the criminal division in the U.S. Attorney's Office in Washington D.C., was asked by the Office of the Deputy Attorney General ("ODAG") to review documentation "to open a criminal investigation into whether a contract had been unlawfully awarded by an executive agency before the change in Administration and to issue grand jury subpoenas pursuant to this investigation."  On information and belief, this request related to the NCIF awardees, including PFC.

107.    Upon reviewing the documentation provided by ODAG, Ms. Cheung and other attorneys in the USAO determined that "the predicate for opening such a grand jury investigation" did not exist.  Exhibit H.  ODAG nonetheless asked "that a type of 'freeze letter' requesting that the bank freeze assets" be sent.  *Id.*  On information and belief, the bank to which this letter was to be sent was Citibank.

108.    Ms. Cheung expressed "some concern about the current lack of evidence of any apparent crime and the need to send out any such freeze letter."  Exhibit H.  She also conveyed her

view that language proposed by the ODAG—which stated that "the government ha[d] probable cause to believe that the funds on deposit … [were] subject to seizure and forfeiture to the United States based upon violations"—was "not appropriate to the matter at hand." *Id.*

109.    Ms. Cheung nonetheless emailed the Washington Field Office of the Federal Bureau of Investigations, which in turn issued a letter to Citibank on February 17, 2025, "recommend[ing]" that Citibank "place an administrative freeze on the account(s) associated with" certain account control agreements—including the ACA among Citibank, PFC, and EPA—"for 30 days." Exhibit H. This was a recommendation only; Citibank was not ordered to freeze any assets. After the FBI sent this recommendation letter, ODAG instructed Ms. Cheung to send a second letter to Citibank "ordering the bank not to release any funds in the subject accounts." *Id.* Ms. Cheung refused because, in her view, there was not "sufficient evidence to issue the letter" requested, "including sufficient evidence to tell the bank that there is probable cause to seize the particular accounts identified." *Id.* The Interim U.S. Attorney in Washington D.C., Edward Martin, thereafter demanded Ms. Cheung's resignation. *Id.*

110.    According to reporting by the *Washington Post* (attached hereto as Exhibit I), Mr. Martin then personally submitted to a U.S. Magistrate Judge in the District of Columbia a seizure warrant application to freeze PFC's Citibank accounts. But, according to the *Washington Post*, the Judge rejected the warrant application, finding that the request and the affidavit submitted therewith failed to establish probable cause that could justify a seizure order. *Id.*

111.    According to the same *Washington Post* report, ODAG then asked another U.S. Attorney's Office (USAO) to launch a grand jury investigation and submit a seizure warrant application to the court. Exhibit I. This USAO, too, refused to do so on the ground that the request was not supported by probable cause. *Id.*

112.    On March 2, 2025, EPA's Acting Deputy Administrator, W.C. McIntosh, formally requested that the EPA Office of the Inspector General review the NCIF program.  In this request, Mr. McIntosh wrote that Citibank "voluntarily paused further disbursements, aligning with the ongoing investigation by DOJ and FBI's publicly reported recommendation to freeze the funds."

113.    None of the foregoing justifies Citibank's actions.  It has received no Notice of Exclusive Control or other legal process authorizing it to suspend the accounts of PFC or the Subrecipients.  Citibank is therefore in breach of the ACAs and is unlawfully withholding funds to which PFC and the Subrecipients are immediately entitled.

## VII.    EPA's Unlawful  Termination of the NCIF Program, Including  PFC's Award

114.    On March 11, 2025, Mr. McIntosh, on behalf of EPA, sent PFC—and every other recipient of an NCIF or CCIA award—a purported "Notice of Termination."  *See* Exhibit J.

115.    In its two-page notice, EPA stated that it was terminating PFC's Award Agreement pursuant to "2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information."  Exhibit J at 1.

116.    Apart from the address line, the Notice does not mention PFC because the generic Notice amounted to an across-the-board cancelation of the NCIF and CCIA programs.

117.    EPA referenced vague "concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities."  Exhibit J.

118.    The agency, however, offered no evidence or allegations to substantiate its stated concerns.  The Notice of Termination contained no individualized allegations whatsoever regarding the conduct of PFC or its Subrecipients:  It contained no allegation that PFC violated any constitutional provision, statute, regulation, or term or condition of the Award Agreement, *see*

2 C.F.R. § 200.339; *supra* ¶ 48; it included no allegation that PFC engaged in any misconduct, *see* 2 C.F.R. § 200.340; *supra* ¶ 48; and it contained no allegation, let alone "credible evidence," that PFC violated any criminal law, including any law involving fraud, conflict of interest, bribery, gratuity violations, or the False Claims Act. *See supra* ¶¶ 48-49. Moreover, the notice contained no allegation that PFC engaged in the material misrepresentation of eligibility status. *See supra* ¶ 49.

119.    The Notice of Termination also alleged "material deficiencies," including "the absence of adequate oversight and account controls to prevent financial mismanagement," "allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and "the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds." Exhibit J at 1.  EPA made no attempt to support these claimed deficiencies in the Notice of Termination.  Nor do the applicable regulations, EPA General Terms and Conditions, or Award Agreement terms and conditions authorize EPA to terminate PFC's award based on such allegations.

120.    The Notice of Termination did not identify the source of "inherent authority" asserted by EPA, nor any "new information" to support EPA's change in position. *See* Exhibit J at 1.

121.    On March 11, 2025, Climate United also received from EPA a Notice of Termination for its NCIF award that is substantially identical to the termination notice PFC received.  At the March 12, 2025 hearing on CU's motion for a temporary restraining order in Civil Action No. 1:25-cv-00698-TSC, the court asked counsel for EPA to identify the factual basis for the agency's allegations of waste, fraud, and abuse in that Notice of Termination.  Counsel for EPA could not do so.

**VIII.   Citibank's and EPA Defendants' Actions Have Harmed PFC and the Subrecipients**

122.   Citibank has prevented PFC and the Subrecipients from accessing their funds for four weeks.  That freeze jeopardizes the ability of PFC and its Subrecipients to carry on day-to-day operations, comply with their legal obligations, and fulfill their respective missions.

123.   By freezing the accounts, Citibank has impaired PFC's and its Subrecipients' ability to pay employees and contractors who perform necessary services.  Numerous PFC and Subrecipient employees' salaries are funded exclusively through the award.  These organizations have also been forced to pause hiring for essential positions, and one organization was forced to retract an offer of employment.

124.   PFC has been unable to pay outstanding invoices from its contractors, including consultants that assist PFC in administering the grant in compliance with the terms of the Award Agreement.  As a result, PFC is at urgent risk of losing these important services due to default.

125.   The budget uncertainty has imperiled PFC's and its Subrecipients' ability to fulfill their missions and meet their obligations under the NCIF workplan.  Ongoing projects are vulnerable to collapse and future projects are stalled.  PFC and its Subrecipients cannot enter into contractual arrangements necessary to advance the NCIF workplan without knowing whether they can meet their financial obligations.  Nor can they issue RFPs or fund projects without knowing that they have financing to do so.  As a result, PFC is at risk of failing to meet milestones set in the NCIF workplan and its obligations under the Award Agreement.  This causes immediate harm not only to PFC and its Subrecipients, but also to the many families and communities that will benefit from these projects to obtain affordable housing, lower utility bills, create jobs, and improve health and safety.

## CAUSES OF ACTION

## COUNT I – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### (Defendants EPA, Administrator Zeldin, Acting Deputy Administrator McIntosh)

126.    PFC repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

127.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

128.    By the express terms of its "Notice of Termination," EPA has purported to effectuate a termination of PFC's grant.

129.    The EPA Defendants' asserted termination of PFC's grant constitutes final agency action under the APA.

130.    Defendants' purported termination of the grant is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because, among other things:

   a. EPA has not provided an adequate, reasoned basis for its termination of the grant. Nor could it, as there is no factual basis that could justify the termination.

   b. EPA cited five bases for its termination authority: "[1-2] 2 C.F.R. § 200.339-40, [3] the General Terms and Conditions of EPA assistance award agreements, [4] the terms and conditions of the Grant Agreement, and [5] the Agency's inherent authority to reconsider prior determinations in light of new information." None is applicable here.

      i. 2 C.F.R. § 200.339 applies only when "the recipient . . . fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." The Notice does not

allege that PFC failed to comply with any constitutional, statutory, regulatory, or contractual provision.

ii.   2 C.F.R. § 200.340 permits termination "[b]y the Federal agency . . . if the recipient . . . fails to comply with the terms and conditions of the Federal award" or "[b]y the Federal agency . . . pursuant to the terms and conditions of the Federal award. . . ."  2 C.F.R. § 200.340(a)(1) and (4).  The Notice does not allege that PFC failed to comply with any terms or conditions of the Award Agreement.

iii.   "The General Terms and Conditions of EPA assistance award agreements" include only one authority for termination: 2 C.F.R. § 200.340.  As noted above, the Notice does not allege any noncompliance or misconduct by PFC, as required to invoke § 200.340.

iv.    "The terms and conditions of the Grant Agreement" include only three grounds for termination, none of which applies here: (1) noncompliance with the grant's Terms and Conditions; (2) "adequate evidence of Waste, Fraud, or Abuse" by the recipient, which is a defined term with reference to Federal criminal or False Claims Act violations; and (3) "material misrepresentation of eligibility status."  The Notice does not allege that PFC failed to comply with any Terms or Conditions, violated any criminal statute or the False Claims Act, or misrepresented any eligibility status.

> v.   The agency's asserted "inherent authority to reconsider prior
>
>      determinations in light of new information" is not tethered to any
>
>      identified source of authority, and in any event, the Notice fails to
>
>      identify "new information" that could support a change in position.

c.   EPA's purported termination of the grant has resulted in improperly withholding
     payment without first making a "determin[ation] that noncompliance cannot be
     remedied by imposing specific conditions." 2 C.F.R. § 200.339.

d.   EPA's purported termination of the grant violates the statute establishing the grant
     fund, 42 U.S.C. § 7434.

e.   EPA's purported termination of the grant violates federal appropriations law,
     which legally requires EPA to spend the funds appropriated for distribution under
     the Greenhouse Gas Reduction Fund, 42 U.S.C. § 7434, because EPA has not
     satisfied the stringent requirements for rescinding an appropriation under 2 U.S.C.
     § 683.

f.   EPA's purported termination of the grant violates EPA regulations and Uniform
     Grant Guidance regulations codified at 2 C.F.R. § 200 *et seq.,* which do not allow
     EPA to terminate PFC's grant under these circumstances.

g.   EPA's purported termination of the grant has not complied with EPA's regulatory
     obligation to take certain procedural steps to terminate the grant agreement, such
     as providing written notice of termination that includes "the reasons for
     termination, the effective date, and the portion of the Federal award to be
     terminated, if applicable."  2 C.F.R. § 200.341.  While EPA has sent a purported
     "Notice of Termination," it failed to provide adequate notice of the reasons for

termination by failing to articulate any substantiated findings of fact with respect to PFC's execution of its obligations, or how any lawful basis for termination has been met.  Indeed, apart from the address line, the Notice nowhere even mentions PFC.

h.    EPA's purported termination of the grant, in conjunction with its earlier conduct to cause Citibank to suspend payments under the grant, has resulted in—and will continue to cause—improper withholding of payment for allowable costs without establishing that PFC has either "failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt to the United States."  2 C.F.R. § 200.305(b)(6).  Nor is there a factual basis for EPA to make such a showing.

131.    As a result of Defendants' conduct, PFC and its award Subrecipients has suffered and will continue to suffer irreparable injury.

132.    PFC is entitled to an injunction against EPA's wrongful action.

133.    Pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706(2), PFC is entitled to a declaration that Defendants' purported termination of the grant is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

**COUNT II – VIOLATION OF THE DUE PROCESS CLAUSE**
**(Defendants EPA, Administrator Zeldin, Acting Deputy Administrator McIntosh)**

134.    PFC repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

135.    Under the Fifth Amendment to the United States Constitution, the government may not deprive a person or entity of a protected property interest without due process of law.

136.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr, lnc.,* 575 U.S. 320, 326–27 (2015).

137.    PFC and its Subrecipients have a protected property interest in the grant funds they were awarded under the NCIF and which were disbursed into their accounts at Citibank.

138.    Defendants purported to terminate PFC's grant without adequate basis.

139.    PFC is entitled to an injunction against the EPA Defendants' wrongful actions.

140.    Pursuant to 28 U.S.C. § 2201, PFC is entitled to a declaration that Defendants' suspension and termination of the grant violated due process of law.

### COUNT III – VIOLATION OF SEPARATION OF POWERS
### (Defendants EPA, Administrator Zeldin, Acting Deputy Administrator McIntosh)

141.    PFC repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

142.    The Executive branch, including the EPA, has only those powers conferred on it by Article II of the Constitution and federal statutes.  Article II entrusts the President with the responsibility to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.

143.    Under Article I's Presentment Clause, Federal legislation must be passed by both chambers of Congress before it may be presented to the President and, if signed, become law. U.S. Const., art. I, § 7, cl. 2.  No provision of the Constitution authorizes the Executive Branch to enact, amend, or repeal statutes, including appropriations approved and signed into law.

144.    Article I's Appropriations Clause provides that no "[m]oney shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. Const. art. I, § 7, and the Spending Clause vests Congress with the power to expend Treasury funds for the "general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.

145.    Neither the President nor executive agencies may unilaterally amend or cancel appropriations Congress has duly enacted.

146.    In purporting to terminate all NCIF and CCIA awards—including PFC's award—EPA seeks to cancel the NCIF and CCIA programs, representing $20 billion of the $27 billion Congress appropriated to provide financial assistance for "the rapid deployment of low- and zero-emission products, technologies, and services."  42 U.S.C. § 7434.

147.    By unilaterally terminating all NCIF and CCIA grant agreements, the EPA Defendants have terminated programs established and funded through lawfully enacted congressional appropriations, without any basis in constitutional or statutory authority.  The EPA Defendants have disregarded Congress's legislative enactments and have exceeded the bounds of Executive authority conferred on that branch by the Constitution, in violation of the Constitution's structural separation of powers, including as manifested in the Take Care Clause, the Bicameralism and Presentment Clauses, the Appropriations Clause, and the Spending Clause.

148.    PFC is entitled to an injunction against the EPA Defendants' wrongful actions.

149.    Plaintiff will suffer irreparable injury if the funding freeze is not reversed and EPA's Notice of Termination of PFC's NCIF award is not deemed invalid and without effect. The public interest favors entry of a declaration that the Notice of Termination is unlawful, in violation of separation of powers, because the public has an interest in vindicating the will of its duly elected representatives, and it has no interest in the perpetuation of unlawful agency action.

## COUNT IV – BREACH OF CONTRACT

150.    PFC repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

151.    The ACAs are a binding and enforceable agreement between PFC, Citibank, and EPA (as to the primary ACA) and between PFC, Citibank, and the Subrecipients (as to the Subrecipient ACAs).

152.    PFC and the Subrecipients have performed each and every obligation and condition required of them pursuant to the ACA.

153.    PFC provided transfer instructions to Citibank, including on February 14, 2025, and March 10, 2025.  Citibank has not complied with those transfer instructions.

154.    The ACAs require Citibank to "comply with all instructions, notifications, and entitlement orders [it] receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts . . . originated by [PFC]." *See* Exhibits D-G at Section 2.

155.    By failing to distribute the funds as directed by PFC and its Subrecipients, including on February 14, March 9, and March 10, Citibank breached the ACAs.

156.    As a direct and proximate result of Citibank's breach of contract, PFC and its Subrecipients have suffered, and will continue to suffer harm.  This harm has resulted solely from Citibank's own gross negligence or willful misconduct.

157.    Citibank's actions are causing and/or threaten to cause irreparable harm to PFC and its Subrecipients that is not compensable through money damages.

158.    Pursuant to 28 U.S.C. § 2201, PFC is entitled to a declaration that Citibank's failure to disburse funds from PFC's and its Subrecipients' accounts is a breach of the ACAs.

159.    PFC and the Subrecipients are entitled to an injunction against Citibank's wrongful refusal to comply with their disbursement instructions.

## COUNT V – CONVERSION

160.     PFC repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

161.     PFC and its Subrecipients have a legal right to possess and control the grant funds held in their accounts at Citibank, pursuant to the ACAs.

162.     Citibank has wrongfully exercised dominion and a right of ownership over PFC's and its Subrecipients' property by freezing PFC's and its Subrecipients' funds without any authority to do so.

163.     PFC demanded Citibank relinquish its wrongful dominion and control over PFC's and its Subrecipients' property and comply with its obligations under the ACAs through its February 14, 2025 and March 1, 2025 letters to Citibank.

164.     As of the date of this Complaint, Citibank has refused to relinquish its wrongful dominion and control over PFC's and its Subrecipients' property.

165.     As a direct and proximate result of Citibank's conversion of PFC's and its Subrecipients' property, PFC and its Subrecipients have suffered, and will continue to suffer harm.

166.     Citibank's actions are causing and/or threaten to cause irreparable harm to PFC and its Subrecipients that is not compensable through money damages.

167.     Pursuant to 28 U.S.C. § 2201, PFC is entitled to a declaration that Citibank's refusal to disburse funds from PFC's and the Subrecipients' accounts constitutes a conversion of those entities' funds.

168.     PFC and the Subrecipients are entitled to an injunction against Citibank's wrongful retention of PFC's and the Subrecipients' funds.

## COUNT VI – REPLEVIN

169.    PFC repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

170.    PFC and its Subrecipients have a property interest in the NCIF funds in the Citibank accounts.

171.    Upon providing transfer instructions to Citibank, PFC and its Subrecipients obtained exclusive right to possession of the funds.

172.    Upon receiving transfer instructions from PFC and its Subrecipients, Citibank had no right to possess the funds.

173.    Citibank has no lawful authority to freeze PFC's and its Subrecipients' accounts, and PFC and its Subrecipients are thus entitled to immediate possession of the funds they have instructed Citibank to transfer to date, including on February 14, March 9, and March 10, 2025.

174.    As a direct and proximate result of Citibank's wrongful retention of PFC's and its Subrecipients' property, PFC and its Subrecipients have suffered, and will continue to suffer harm.

175.    Citibank's actions are causing and/or threaten to cause irreparable harm to PFC and its Subrecipients that is not compensable through money damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Power Forward Communities, Inc. respectfully requests that this Court grant the following relief:

i.      Declare that the EPA Defendants' purported termination of the grant violates the Administrative Procedure Act;

ii.     Declare that the EPA Defendants' actions violate the Due Process Clause;

iii.      Enjoin the EPA Defendants from unlawfully suspending or terminating PFC's grant award except as permitted by the terms of the ACA, the grant award, and applicable law;

iv.      Declare that Citibank's refusal to disburse funds from PFC's and the Subrecipients' Accounts constitutes a breach of the ACAs and violates PFC's and the Subrecipients' legal right of ownership in those funds;

v.      Compel Citibank to disburse all funds PFC and its Subrecipients have requested since February 14, 2025;

vi.      Compel Citibank to comply with its ongoing obligation to disburse funds to PFC and its Subrecipients immediately upon receiving transfer instructions from those entities, except as expressly authorized by the ACA and Subrecipient ACAs;

vii.      Enjoin Citibank from refusing to disburse funds to PFC and its Subrecipients immediately upon PFC's transfer instruction, except as expressly authorized by the ACA and Subrecipient ACAs;

viii.      Enter judgment for PFC and against Citibank and EPA Defendants on all counts of this Complaint;

ix.      Grant any such other relief that the Court deems just and proper.

Dated:  March 14, 2025

Respectfully submitted,

Noah C. Shaw (*pro hac vice* forthcoming)
James M. Gross (*pro hac vice* forthcoming)
FOLEY HOAG LLP
1301 Ave. of the Americas
25th Floor
New York, NY 10019
Tel. (212) 812-0400
ncshaw@foleyhoag.com
jgross@foleyhoag.com

*/s/ Beth C. Neitzel*
Beth C. Neitzel (103611)
Jack C. Smith (1725229)
Kevin Y. Chen (*pro hac vice* forthcoming)
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
bneitzel@foleyhoag.com
jcsmith@foleyhoag.com
kchen@foleyhoag.com

*Counsel for Power Forward Communities, Inc.*