# EXHIBIT I

Democracy Dies in Darkness

EXCLUSIVE

# FBI investigating Trump EPA claims of fraud in $20B Biden grant fund

While career prosecutors in two U.S. attorney offices and a U.S. judge balked at a court-ordered freeze, Citibank has locked down billions without explanation

Yesterday at 8:21 p.m. EST

10 min      742

By Spencer S. Hsu, Maxine Joselow and Nicolás Rivero

FBI agents this week questioned Environmental Protection Agency employees regarding a Biden administration grant program for climate and clean-energy projects, escalating a criminal probe that already caused one veteran prosecutor to resign, according to two people familiar with the matter.

The move came after the Justice Department in recent weeks took unusual steps to advance the investigation, having a Trump-appointed U.S. attorney submit a warrant request when career prosecutors were unwilling and seeking prosecutors in other offices who would agree to participate in the case, people familiar with the matter said, speaking on the condition of anonymity to disclose internal deliberations about an ongoing criminal investigation.

At issue are grants totaling $20 billion under the Greenhouse Gas Reduction Fund, a program established in President Joe Biden's signature 2022 climate law. The fund seeks to leverage public and private dollars to invest in clean-energy technologies such as solar panels, heat pumps and more, including through community lenders in low-income areas. The Trump-appointed EPA administrator has alleged publicly that the money was awarded with little oversight and said the agency would try to claw back the money from Citibank, which was tasked with disbursing the funds.

The administration ran into its first roadblock in that effort last week, when a senior career prosecutor in the U.S. attorney's office in D.C. resigned rather than carry out the administration's demand to freeze the funds over possible wire fraud. But the investigation did not end there, according to people familiar with the matter.

Interim U.S. attorney Ed Martin then personally submitted a seizure warrant application without any other prosecutors in his office that was rejected by a U.S. magistrate judge in D.C., who found that the request and accompanying FBI agent affidavit failed to establish a reasonable belief that a crime occurred, three of the people said.

Meanwhile, acting deputy attorney general Emil Bove's office approached at least one other U.S. attorney's office in the southeastern United States to launch a grand jury investigation and seek a court-ordered bank freeze, but prosecutors in the office again refused the warrant request, two of the people said. It is not clear whether more evidence has since been obtained or if a warrant was granted elsewhere. But at least three groups that had been awarded money said their accounts have been frozen, and the bank won't tell them why.

Stefan D. Cassella, a former federal prosecutor whose writings on asset forfeiture and money laundering are used widely by judges, prosecutors and defense attorneys, said the moves were atypical.

"It's certainly unusual for any case to involve two different U.S. attorney offices declining a case for lack of probable cause and to have the Department of Justice continue to shop it. That's very unusual. And certainly it would be unusual to continue to shop it after a judge turned it down," he said. "You can't seize a truck, you can't seize a backpack, you can't seize a pair of socks without probable cause."

The DOJ-initiated FBI investigative activity was confirmed by one person briefed on the matter and a second with direct knowledge. One said agents sought information regarding spending under the two components of the Biden "green bank" grant initiative, the National Clean Investment Fund and the Clean Communities Investment Accelerator programs, which seek to finance clean-technology and clean-energy projects.

Citibank — which holds the accounts for the programs — declined to comment for this article, as did the FBI's Washington field office. A Justice Department spokesman said, "Per our usual policy, the department declines to confirm or deny the existence of an ongoing investigation." An EPA spokesperson repeated department administrator Lee Zeldin's allegations.

"When we learned about the Biden administration's scheme to quickly park $20 billion outside the agency, we suspected that some organizations were created out of thin air just to take advantage of this," the spokesperson said. "As we continue to learn more about where some of this money went, it is even more apparent how far-reaching and widely accepted this waste and abuse has been."

The events began to unfold Feb. 12, when Zeldin said the agency would try to claw back the $20 billion and terminate its contract with Citibank for disbursing the funds. Zeldin claimed the Biden administration had awarded the money in "a rush job with reduced oversight," although he did not provide any specific evidence of abuses.

The EPA chief cited a secretly recorded video from Project Veritas, a right-wing group known for its undercover sting operations, in which an EPA official said the Biden administration was "trying to get the money out as fast as possible before they come in and stop it all. … It truly feels like we're on the Titanic and we're throwing, like, gold bars off the edge."

About a week later, on Feb. 18, the head of the criminal division in the U.S. attorney's office in D.C. resigned after declining to order Citibank to freeze the accounts. Denise Cheung wrote in her resignation letter that the criminal investigation sought by Bove and Martin was unfounded.

She added that Martin overruled her judgment that there was insufficient evidence of a crime to order a bank freeze. Cheung wrote that Bove's office and Martin pressed her to act on Presidents' Day, Feb. 17, a federal and banking holiday.

A government effort to essentially seize billions of dollars in grants awarded by the government by preventing their release is "extraordinary and probably unprecedented," whether done voluntarily by the bank at government request or ordered through a court-approved seizure warrant, said Cassella, the asset forfeiture and money laundering expert. A freeze on all the green grant funds would eclipse by far the U.S. government's largest confirmed financial seizure, when it froze stolen bitcoin worth more than $4 billion in 2022.

While it is not unusual for the FBI or EPA's internal watchdog agency to investigate the spending of taxpayer dollars, ordering a bank to freeze accounts without adequate evidence or legal basis would be a misuse of the Justice Department's powers of criminal investigation, he said.

"To seize bank accounts without probable cause would be illegal" and "a misuse of asset forfeiture laws," Cassella said. "That's why prosecutors in D.C. responsibly refused to do it." He added, "That doesn't mean they didn't turn up new evidence … and a warrant would be appropriate, but we don't know that."

Three grant recipient organizations told The Washington Post they have been unable to draw funds from their Citibank accounts in the past two weeks with no explanation from the bank or the EPA, affecting their ability to pay workers and expenses.

A spokeswoman for the Climate United Fund — a coalition of nonprofit groups that received the largest grant award, nearly $7 billion — said its account has been frozen since Feb. 18, the day Cheung's resignation became public. She said the organization hasn't received a response to several letters and is considering all of its options.

Spokespeople for the Coalition for Green Capital and Justice Climate Fund — which received $5 billion and $940 million, respectively — said they had received no explanation about why their accounts were frozen. Justice Climate Fund claimed its account was frozen Feb. 14, the Friday before Cheung resigned. The three groups are among eight grant recipients to whom the EPA has awarded $20 billion to invest in tens of thousands of projects to fight climate change and promote environmental justice.

Federal asset seizure and forfeiture actions with banks typically unfold in several stages. U.S. prosecutors can covertly investigate a matter, requesting information from a bank — usually with a subpoena from a grand jury. To freeze or seize a bank account, however, they need a warrant issued by a judge. Under limited, emergency circumstances, they can ask a bank to freeze an account temporarily while a seizure warrant is sought under seal, but they still need probable cause.

Finally, the government can go forward with publicly filed charges or a criminal or civil forfeiture action. Any warrant or court-ordered freeze requires probable cause and notice to the account owner in 60 days, Cassella said.

For liability reasons, a bank usually is eager to explain if its action against a customer is at government order. Absent such notice, it is up to the account holder to challenge the action in court if it wants answers or its money.

In her letter, Cheung said she and the FBI Washington field office agreed that it could write to the bank recommending a 30-day administrative freeze on the assets, but not compel it as part of a criminal investigation. Cheung said she wrote to the FBI that her office believed there may be "potential violations" of federal wire fraud and conspiracy statutes meriting additional investigation, but that the probable cause standard for ordering a freeze had not been met.

Meanwhile, the former EPA official in the Project Veritas video, Brent Efron, was contacted last week by the EPA's inspector general's office and on Monday by an FBI agent from Washington at the request of Miami federal prosecutor Joshua Paster, deputy chief of an asset forfeiture unit with the southern district of Florida, according to a person familiar with the matter. The Miami office is at least the third U.S. attorney's office asked to take part in the investigation. It was not clear if Paster would remain on the case, the person said.

Spokespeople for the U.S. attorney's offices in D.C. and Miami declined to comment.

Efron's lawyer, Mark Zaid, said in an interview that his client "doesn't know what this is about, and that he was never involved in the obligation or disbursement of funds from any EPA assistance program, including NCIF and CCIA [held at Citibank]. And he was not involved in any conversations about EPA and Citibank."

Testifying Wednesday before a House Energy and Commerce oversight subcommittee, EPA acting inspector general Nicole N. Murley said her office also was reviewing spending under the law that created the grant program, adding that EPA's push to meet statutory deadlines raised concerns over the proper vetting of grant recipients, proposed projects and the monitoring of funds.

Murley's office has jurisdiction to investigate fraud, waste and abuse at the EPA — including potential violations of federal fraud, theft and money laundering laws — and is typically the entity to investigate the agency's own spending.

Conservative groups with ties to the fossil-fuel and mining industries praised the EPA's action.

"The Biden administration intended to use a large part of that $20 billion to fund leftist activist groups," said Myron Ebell, a former Trump EPA transition adviser who chairs the American Lands Council, which seeks the transfer of federal land to states, and who has called for repealing the central scientific finding for U.S. action against climate change.

Martin, the U.S. attorney in D.C., also posted about the Climate United Fund before taking office, saying in October, "Insanity: $6.7 billion given to Green activists by Biden to disburse to others. Total graft. Needs to be stopped. @elonmusk better look at this one as DOGE king."

After Zeldin's announcement this month, the U.S. DOGE Service, a group billionaire Elon Musk oversees that aims to slash the size of the federal government, praised him on X for an "awesome job" on saving taxpayer money.

> **What readers are saying**
> The comments express strong skepticism and criticism of the Justice Department's investigation into Biden-era climate grants, suggesting it is politically motivated and lacks evidence. Many commenters view the investigation as an example of the Trump administration's alleged… Show more
> This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.