# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-698 |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |
| **COALITION FOR GREEN CAPITAL** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-735 |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |
| **POWER FORWARD COMMUNITIES, INC.** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-762 |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |

## **MEMORANDUM OPINION**

Plaintiffs Climate United Fund ("Climate United"), Coalition for Green Capital ("CGC"), and Power Forward Communities, Inc. ("PFC") are nonprofit financial institutions who, in April 2024, were awarded grant funding by the U.S. Environmental Protection Agency ("EPA") to finance clean technology projects nationwide. Under the National Clean Investment Fund ("NCIF"), Climate United was awarded $6.97 billion, CGC was awarded $5 billion, and PFC was awarded $2 billion. The grant requires that Plaintiffs' funds be held at Citibank, N.A. ("Citibank") under the parties' respective agreements.

On March 8, March 12, and March 14, 2025, Climate United, CGC, and PFC, respectively, sued Citibank, and EPA, EPA Administrator Lee Zeldin, and EPA Acting Deputy Administrator William Charles McIntosh (collectively, "EPA Defendants"), seeking declaratory and injunctive relief after EPA Defendants unilaterally terminated Plaintiffs' grant awards.[1] Plaintiffs bring a variety of claims, including breach of contract, conversion, and replevin against Citibank, claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and the Due Process Clause, against EPA Defendants, claiming its actions violated multiple regulations, statutes, and constitutional provisions.

In mid-February 2025, Plaintiffs attempted to draw on funds from their respective accounts, to no avail. They received little to no communication from Citibank and EPA Defendants regarding their inability to access their funds. On March 11, 2025, EPA Defendants transmitted nearly identical "Notice of Termination" letters to Plaintiffs, indicating that EPA was

---

[1] On March 17, 2025, Plaintiff Climate United filed an Amended Complaint. *See Climate United*, ECF No. 24. Plaintiff Climate United sues Citibank, EPA, and EPA Administrator Lee Zeldin only. *Id.* Plaintiff PFC sues on behalf of itself and certain of its award subrecipients. *See Power Forward*, Compl. ECF No 1.

terminating their grants effectively immediately. *Climate United*, Notice of Grant Termination Letter ("Termination Letter"), ECF No. 13-1; *Power Forward*, Notice of Grant Termination Letter, ECF No. 1-10; *Coalition Green Capital*, Compl. ¶ 13.

That same week, Plaintiffs individually moved for a Temporary Restraining Order ("TRO"), seeking to enjoin Citibank from violating its legal and contractual obligations to disburse grant money owed to Plaintiffs, to enjoin Citibank from transferring Plaintiffs' grant funds out of their accounts, to enjoin Defendants from giving effect to EPA Defendants' Termination Letter, and to enjoin EPA Defendants from taking action to, among other things, implement the termination of Plaintiffs' grant awards. On March 12, and March 17, 2025, the court held hearings on the motions. *See* March 12, 2025 Min. Order; *see* March 16, 2025 Min. Order.

Based on the parties' briefing, oral argument, and the record, the court finds that Plaintiffs have carried their burden of showing that they will suffer imminent, irreparable harm absent a temporary restraining order. It will therefore GRANT Plaintiffs' motions and enters a temporary restraining order, though more limited in scope than Plaintiffs' proposed orders.

## I.    BACKGROUND

### A. EPA Grant Funding – Statutory Background

In 2022, Congress passed, and President Biden signed into law, the Inflation Reduction Act ("Act"). Pub. L. No. 117-169, 136 Stat. 1818. The Act authorized the Greenhouse Gas Reduction Fund ("GGFR"), which appropriated approximately $27 billion to the EPA Administrator to make grants available to eligible recipients for various climate projects. *See* 42 U.S.C. § 7434(a)(1)–(3).

In 2023, EPA launched three grant competitions under the GGRF, including the $14 billion National Clean Investment Fund ("NCIF") competition, geared at "financ[ing] clean technology

deployment nationally." *Climate United* Am. Compl. ¶ 80*; see Climate United*, TRO Mot. Ex. 1, ECF No. 2-3. The purpose of the NCIF was to "provide grants to 2-3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector to provide accessible, affordable financing for tens of thousands of clean technology projects nationwide." *Climate United*, ECF No. 2-3 at 4.

### B. Climate United, CGC, and PFC Apply for and Win EPA Grants

In October 2023, Plaintiffs applied for grant funding through the NCIF, and in April 2024, EPA awarded Climate United $6.97 billion, CGC $5 billion, and PFC $2 billion in grant funding. *Climate United*, Am. Compl. ¶¶ 48; *Power Forward*, Compl. ¶¶ 37–38; *Coalition Green Capital*, Compl. ¶ 2. Plaintiffs developed, and EPA approved, their respective workplans. Plaintiffs have begun implementing these workplans—some have committed funds to projects, *see Climate United*, Compl. ¶ 37 (noting that Climate United has committed $392 million to qualified projects), or entered into contracts with third parties, subrecipients, or subgrantees. *See Power Forward*, Compl. ¶¶ 18–23.

#### a. *Award Agreements and Relevant Regulations*

Plaintiffs' grant awards were memorialized in grant agreements between Plaintiffs and EPA, which include 'Terms and Conditions' governing, among other things, EPA's termination of the award. *Climate United*, Am. Compl. ¶¶ 50–59. The Terms and Conditions specify that EPA may only terminate an award under three circumstances:

> (1) If a grant recipient engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." Performance is deemed "Materially Impaired" if: (1) EPA issues a "written determination and finding . . . that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause;" and (2) if EPA determines in its sole discretion that a "corrective action plan" would remedy the issue and EPA issues a "separate

written determination and finding" that the Recipient "has not materially addressed its failure."

(2) If a Recipient engages in "material misrepresentation of eligibility status;" and

(3) For "Waste, Fraud, or Abuse," which is defined with reference to EPA General Terms and Conditions and 2 C.F.R. § 200.113. Termination on these grounds require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. §§ 3729-3733)."

*See, e.g.*, *Climate United*, TRO Mot. Ex. 2, ECF No. 2-4 at 42.

Grant award recipients also agree to comply with EPA's general terms and conditions, "in addition to the assurances and certifications made as part of the award" and which provide for situations where EPA may unliterally terminate an award, which shall be "consistent with 2 C.F.R. § 200.340." *Id.* at 8.

Under the relevant regulations, a federal award may be terminated by the agency "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award," or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(1), (4).

EPA must also take certain procedural steps before it can terminate federal awards. For example, under 2 C.F.R. § 200.341, EPA must provide written notice of termination that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated[.]" Under 2 C.F.R. § 200.342, titled, 'Opportunities to object, hearings, and appeals,' "[u]pon initiating a remedy for noncompliance"—such as termination—"the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action." The agency must "comply with any requirements for hearings, appeals, or other

administrative proceedings to which the recipient or subrecipient is entitled under any statute or regulation applicable to the action involved." *Id.*

### C.  Agreements Between Citibank, EPA, and Plaintiffs

Under the grant agreements, Plaintiffs' grant funds must be held at Citibank under their respective Financial Agency Agreement ("FAA") between Citibank and the U.S. Treasury Department, and respective Account Control Agreement ("ACA") between Citibank, EPA, and Plaintiffs. *See Climate United*, TRO Mot. at 11–12; *Coalition Green Capital*, Compl. ¶¶ 4–6.

Under the ACA, Citibank is "designated and authorized to act as a financial agent of the United States" under the authority of the Treasury Department, and it administers and disburses the funds provided under the NCIF. *Climate United*, TRO Mot. Ex. 8 at 3, ECF No. 2-10, Account Control Agreement. Citibank must "comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets" and must release Plaintiffs' funds at their request, unless EPA—considered a "Secured Party" to the agreement—issues a "Notice of Exclusive Control stating that it is exercising its right to exclusive control over an Account." *Id.* at 4; *see also* Citibank Opp'n in *Climate United*, Ex. 1 at 25, ECF No. 14-4. Similarly, under the FAA, Citibank acts as a financial agent of the United States and provides banking and financial services related to EPA's grant programs, including the one here. *Id.* Ex. 1, ECF No. 14-1, Financial Agency Agreement (SEALED).

### D.  EPA Administrator and Funds Pause

On January 30, 2025, the Senate confirmed Lee Zeldin as EPA Administrator. *See Climate United*, Am. Compl. ¶ 89. On February 12, 2025, Administrator Zeldin publicly announced that EPA intended to take control of grant funds disbursed under the Inflation Reduction Act. *Id.* ¶ 90. In public statements, Administrator Zeldin declared that "the financial agent agreement with the

Bank needs to be instantly terminated," "the Bank must immediately return" the funding, and EPA is "not going to rest" until it has "recovered" the grant funds. *Id.*

On February 23, 2025, Administrator Zeldin discussed the GGRF program on a television program, stating that "the entire scheme, in my opinion, is criminal." *Id.* ¶ 91(f). One week later, on March 2, 2025, EPA issued a letter to its Office of the Inspector General requesting an investigation into GGRF. *Id.* ¶ 91(g).

Pursuant to the agreements discussed above, Plaintiffs would periodically request disbursement of their funds through Citibank. *See, e.g.*, *Climate United*, TRO Mot. at 14 (requested funds every two weeks); Decl. of Elizabeth Brafford ("Brafford Decl.") ¶ 21, ECF No. 2-2. But in-mid February 2025, when Plaintiffs placed their usual request, Citibank did not release the funds. *Climate United*, TRO Mot. at 18–19**.** Though Plaintiffs requested access to their funds throughout February and March 2025, Citibank did not release the funds, and did not respond to Plaintiffs' inquiries. Around March 3, 2025, Citibank informed at least one Plaintiff, Climate United, that it had forwarded its communications to EPA and was "awaiting further guidance." *See Climate United*, TRO Mot. Ex. 6, ECF No. 2-8 (email correspondence between Citibank and Climate United).

During this time, EPA also did not respond to Plaintiffs' inquiries. *See* Brafford Decl. ¶ 10. It offered to meet with Climate United during the week of February 24, and Climate United agreed. *Climate United*, TRO Mot. Ex. 7 at 7, ECF No. 2-9. EPA rescheduled the meeting three times and then canceled it without explanation. Brafford Decl. ¶ 34. Climate United requested a smaller meeting, in case scheduling for multiple people was the challenge, and received no response. *Climate United*, TRO Mot. at 1. Climate United claims it did not receive any "substantive communication from the EPA" or notice as to why it could not access its funds. *Id.*

On March 4, 2025, the Treasury Department instructed Citibank not to disburse any GGRF funds through March 9, 2025, and on March 10, 2025, EPA directed Citibank to continue to refrain from processing payments.  Citibank Opp'n Ex. 7, ECF No. 14-7; *id.*, Ex. 2, ECF No. 14-2.

### E.  Grant Termination Letter

On March 8, 2025, Climate United filed suit and moved for a TRO.  *Climate United*, ECF No. 2.  In support of their motion, they attached several exhibits, including (1) a declaration from Elizabeth Bafford, Climate United's CEO; (2) the Account Control Agreement ("ACA") between Climate United, Citibank, and EPA; and (3) the grant award agreement.  *Id.*

The court informed the parties that it was inclined to set a hearing for March 11, 2025, and have opposition briefs due that same day.  EPA Defendants "asked for an extension as a professional courtesy," which Climate United agreed to.  TRO Mot. Hr'g Tr. 10:06–12 (March 12, 2025), ECF No. 22.  The court scheduled a hearing on the motion for March 12, 2025.  March 12, 2025 Min. Order.

A day before the scheduled hearing, on March 11, EPA Defendants sent Plaintiffs identical letters informing them that EPA was terminating Plaintiffs' "grant effective immediately."  *See* Termination Letter at 1–2.  EPA Defendants stated that they terminated the grants "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."  *Id.* at 1.  The letters stated that "following a comprehensive review and consistent with multiple ongoing independent federal investigations into programmatic fraud, waste, abuse and conflicts of interest EPA has identified material deficiencies," including "absence of adequate oversight and account controls," "improper or speculative allocation of funds inconsistent with EPA's oversight and

fiscal responsibilities," and "circumvention and defeat of key oversight mechanisms in the disbursement of federal funds." *Id.* The letter instructed Plaintiffs to cease all further program expenditures immediately.

On March 12, 2025, EPA Defendants filed an opposition to Climate United's TRO, attaching nine exhibits, including communications between EPA Defendants and Plaintiff Climate United and between EPA Defendants and Citibank. Defs.' Opp'n to Mot. ("Defs.' Opp'n"), ECF No. 16. Citibank also filed its opposition, attaching seven exhibits, including various communications between Citibank and Treasury and Citibank and EPA Defendants, and the FAA between Citibank and Treasury. Citibank Opp'n, ECF No. 14.

On March 12, and March 14, 2025, CGC and PFC filed a similar suit against Citibank and EPA Defendants, and both subsequently moved for a TRO. *Coalition Green Capital*, Compl.; *Power Forward*, Compl.

## II. LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion." *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021) (quoting *Postal Police Off. Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 418 (D.D.C. 2020)). As with a preliminary injunction, a party seeking a TRO must establish "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).

A court also considers the "underlying purpose" of a TRO—"preserving the status quo and preventing irreparable harm" until it has an opportunity to rule on the merits. *See Granny Goose*

*Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974); *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202 (D.D.C. 2011) ("The court may issue a temporary restraining order ('TRO') when a movant is faced with the possibility that irreparable injury will occur even before the hearing for a preliminary injunction required by Federal Rule of Civil Procedure 65(a) can be held."); *Elec. Data Sys. Fed. Corp. v. Gen. Servs. Admin.*, 629 F. Supp. 350, 352 (D.D.C. 1986) ("In the context of the limited purpose of a temporary restraining order, the Court's analysis of these factors seeks principally to ensure preservation of the status quo.").

### III.    ANALYSIS

The court finds that, on the record currently before it, Plaintiffs are entitled to a temporary restraining order.

#### A. Jurisdiction

First, EPA Defendants argue that the court lacks jurisdiction to hear this case because "the relief Plaintiff seeks is entirely contractual in nature" and "really amounts to a breach-of-contract claim." Defs.' Opp'n at 15. According to EPA Defendants, jurisdiction therefore lies in the Court of Federal Claims. At the March 17 hearing, EPA Defendants re-iterated this position for all Plaintiffs. This argument is unavailing.

Under the Tucker Act, 28 U.S.C. § 1491, the Court of Federal Claims has exclusive jurisdiction over certain contract and monetary claims against the government. But the D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley Gov't Servs., Inc.*

*v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)).

In determining whether a claim falls under the Tucker Act the court must decide if the action "is at its essence a contract claim." *Id.* at 1106 (quoting *Megapulse*, 672 F.2d at 967). The D.C. Circuit has instructed that "whether a claim is 'at its essence' contractual" depends "both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Id.* (quoting *Megapulse*, 672 F.2d at 968).

Plaintiffs' claims are not at their "essence contractual." Plaintiffs sued Citibank and EPA Defendants after Citibank refused to release their grant funds and after EPA Defendants unilaterally terminated these grants, without giving Plaintiffs any meaningful opportunity to be heard. They challenge the unlawful terminations and EPA's failure to take the necessary procedural steps before terminating the grant awards. Plaintiffs do not challenge a contract between the parties—they challenge an action. And "exclusive jurisdiction in Claims Court under the Tucker Act does not lie 'merely because [a plaintiff] hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant.'" *Id.* at 1108 (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)). This court has jurisdiction over the alleged due process and "arbitrary and capricious" agency actions under the U.S. Constitution and the APA, 5 U.S.C. § 702.

Moreover, Plaintiffs were awarded this grant pursuant to a statute authorized by Congress. As the Supreme Court has noted, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Kentucky Dept. of Educ.,* 470 U.S. 656, 669 (1985). Plaintiffs' "claims arise under a federal grant program and turn on the interpretation

of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties." *Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (citation omitted).   EPA Defendants' termination of these grants appears to contravene a duly enacted statute and interferes with Plaintiffs' statutory rights to these funds.

At bottom, Plaintiffs do not bring simple breach of contract claims—they challenge adverse agency action.   Plaintiffs neither seek money damages nor ask the court to interpret the terms of any contract.   They instead ask the court to determine whether EPA Defendants' actions in terminating the grant were, as EPA Defendants contend, "reasonable and in compliance with EPA's rights under the Grant Agreement."   Defs.' Opp'n at 15.   A decision on that issue would enable Plaintiffs to avail themselves "of statutory and regulatory provisions and procedures that may, or may not, entitle [it] to a monetary recovery."   *Tootle v. Sec'y of Navy*, 446 F.3d 167, 175 (D.C. Cir. 2006) (collecting authorities).

Finally, cases "have long recognized" that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"   *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).   Indeed, "a claim is not for money merely because its success may lead to pecuniary costs for the government or benefits for the plaintiff."   *Kidwell*, 56 F.3d at 285; *see Vietnam Veterans v. Sec'y of the Navy,* 843 F.2d 528, 534 (D.C. Cir. 1988).   And as is true here, any monetary benefit that might flow to Plaintiffs "would not come from this court's exercise of jurisdiction, but from the structure of statutory and regulatory requirements governing compensation" in this action.   *Tootle*, 446 F.3d 167 at 174 (citation omitted).

### B. Mootness

Second, EPA Defendants argue that the request for a temporary restraining order is now moot because "EPA terminated the Grant, [] ending Plaintiff's performance and its right to request disbursement of funds." Defs.' Opp'n at 13. The court disagrees.[2]

Article III of the U.S. Constitution requires a case or controversy to remain live "at all stages of review." *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597 (2013) (quoting *United States v. Juv. Male*, 564 U.S. 932, 963 (2011)). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). A case is also moot "if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Alvarez v. Smith*, 558 U.S. 87, 93 (2009)).

Based on the parties' arguments and the record, the court finds that there is a live controversy, and Plaintiffs' claims are not moot. The fact that EPA Defendants have done one of the things that Plaintiffs sought to enjoin—unilaterally terminated their grants—does not mean the controversy no longer exists. In fact, there is perhaps even more of a controversy over Plaintiffs' particular legal rights here. As discussed above, and at the very least, there are serious due process concerns and questions of whether EPA Defendants' actions were "arbitrary, capricious, an abuse of discretion, [] otherwise not in accordance with law," contrary to statute, or unsupported by substantial evidence in violation of the APA, 5 U.S.C. § 706(2).

---

[2] While EPA Defendants did not address mootness at the March 17 hearing, the court addresses the argument and addresses it as to all Plaintiffs.

### C. Temporary Restraining Order

#### a. Likelihood of Success on the Merits

Plaintiffs challenge, among other things, EPA Defendants' actions as arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, and violation of their due process rights.  In its *Climate United* opposition, EPA Defendants counter that its termination of the grant was "eminently reasonable—not arbitrary and capricious," and "the only responsible course in the interim [] to suspend further grant disbursements that might otherwise be unrecoverable."  Defs.' Opp'n at 21.  But based on the record before the court, and under the relevant statutes and various agreements, it does not appear that EPA Defendants took the legally required steps necessary to terminate these grants, such that its actions were arbitrary and capricious.  And when questioned at the March 12 hearing, and as discussed further below, EPA Defendants proffered no evidence to support their basis for the sudden terminations, or that they followed the proper procedures.[3]  Consequently, Plaintiffs have shown a substantial likelihood of success on the merits of their APA and due process claims.

The Terms and Conditions governing the grant award expressly limit EPA to three possible grounds for termination: "when [1] the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or [2] there is adequate evidence of Waste, Fraud, or Abuse or [3] material misrepresentation of eligibility

---

[3] TRO Mot. Hr'g Tr. 21:06–22 (March 12, 2025), ECF No. 22 (cleaned up): MR. SACKS: And, again, the termination, to my knowledge, is based on what's set forth in the [] letter.  THE COURT: Tell me, can you proffer to me the evidence of commission of a violation of federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations? Any one of those things? MR. SACKS: I cannot, Your Honor. And I think the reason I cannot is because this Court is not in a position to rule upon whether or not this termination was consistent with the contracts. THE COURT: That's why you can't provide it to me or you don't have it? MR. SACKS: No, I don't have it. Yeah, I don't have it."

status[.]" *Climate United*, TRO Mot. Ex. 3 at 41, ECF No. 2-5.  The termination letter states that the termination was pursuant to 2 C.F.R. § 200.339 and § 200.340 and "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."  Termination Letter at 1.

EPA's General Terms and Conditions allow for unilateral termination of an award, which shall be "consistent with 2 C.F.R. § 200.340."  *See* Amidon Decl. ¶ 27.  Under 2 C.F.R. § 200.340, a grant may be terminated if a recipient fails to comply with the terms and conditions of the award, *id.* § 200.340(a)(1), or pursuant to the terms and conditions of the award, including *to the extent authorized by law*, if an award no longer effectuates the program goals or agency priorities, *id.* § 200.340(a)(4) (emphasis added).

But as explained, *see supra* Section I(B)(a), EPA must take certain procedural steps before it can terminate a federal award.  It must provide written notice of a grant termination, 2 C.F.R. § 200.341, and it must "provide the recipient with an opportunity to object and provide information challenging the action" and comply "with any requirements for hearings, appeals, or other administrative proceedings to which the recipient or subrecipient is entitled under any statute or regulation applicable to the action involved," 2 C.F.R. § 200.342.

Though EPA Defendants provided written notice, they did not comply with 2 C.F.R. § 200.342 and allow Plaintiffs "an opportunity to object and provide information challenging the action" when it unilaterally terminated their grants.  Moreover, as to all Plaintiffs, EPA Defendants did not and have not identified a violation of any applicable regulation or any of the grant's terms— only that there are concerns about potential conflicts of interest and their grant agreements.  If these concerns are valid, there are, again, procedures that must be followed.

In the termination letters, EPA Defendants vaguely reference "multiple ongoing investigations" into "programmatic waste, fraud, and abuse and conflicts of interest" but offer no specific information about such investigations, factual support for the decision, or an individualized explanation for each Plaintiff.   This is insufficient.   EPA may terminate the agreements for "waste, fraud, or abuse," but this requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. §§ 3729-3733)."   At this stage, EPA Defendants have not provided the "credible evidence" required.

At the court's request, on March 17, 2025, EPA Defendants submitted a declaration from Eric Amidon, EPA's Chief of Staff.   Amidon Decl.; *see* March 14, 2025 Min. Order ("Federal Defendants shall file a declaration addressing the basis for the grant termination, [] including the proffer of evidence discussed at the hearing.").   In his declaration, Amidon details the agency's general concerns with management of the GGRF program, including concerns with lack of adequate oversight and transparency into use of grant funding and in the grant agreements, and potential conflicts of interest among the grant recipients.   *See* Amidon Decl. ¶¶ 31–39.

As to individual Plaintiffs, Amidon cites to potential conflicts of interest and concerns about the structure of their grant agreements.   *Id.* ¶¶ 34–37.   These concerns stemmed, in part, from public media reporting.   *Id.* ¶ 33–35.   Amidon also states that there are ongoing criminal and civil investigations and that the EPA Office of Inspector General has initiated an investigation into the GGRF program.   *Id.* ¶¶ 43.   At this juncture, EPA Defendants have not sufficiently explained

why unilaterally terminating Plaintiffs' grant awards was a rational precursor to reviewing the GGRF program.[4]

At the March 12 hearing, when asked why the grant was terminated, EPA Defendants stated that "the termination is based on the information contained in the termination letter."  TRO Mot. Hr'g Tr. 18:04–5 (March 12).  When pressed to, at a minimum, even proffer such evidence, counsel for EPA Defendants was unable to, stating that he was only aware of media reports discussing the termination.  This circular argument and unhelpful response was of no assistance to the court in discerning whether EPA Defendants followed the necessary steps to terminate the grant, or whether EPA Defendants had offered a reasoned explanation for the termination.

To be sure, agencies can decide to re-evaluate their programs, or they may decide to end agreements or federal awards.  But those decisions must be made lawfully and in accordance with established procedures and relevant rules and regulations, including the 'Remedies for

---

[4] EPA Defendants state that DOJ and FBI have initiated a criminal investigation into the GGRF program, though they offer not much else on the matter.  *See* Amidon Decl. ¶¶ 42–43.  Plaintiff Climate United proffers news reports of the government's thus far unsuccessful attempts to open a criminal investigation into Climate United's grant award.  *Climate United*, Compl. ¶ 65.  For example, according to public reporting, the Office of the Deputy Attorney General at the Department of Justice ("ODAG") instructed the D.C. U.S. Attorney's Office ("USAO-DC") to open a criminal investigation into the grant award.  *Id.*  Denise Cheung—Chief of the Criminal Division at USAO-DC at the time—advised that there was no adequate factual basis for a grand jury investigation.  *Id.*  When ODAG instructed that a letter be sent directing Citibank to refrain from releasing funds pursuant to a criminal investigation, senior officials at the USAO-DC again asserted there was insufficient evidence to justify issuing that letter.  Denise Cheung refused to send the letter and resigned.  *Id.*  Other news reports indicate that the Interim D.C. U.S. Attorney submitted a seizure warrant application, which a magistrate judge rejected.  There are also reports that ODAG sought a different U.S. attorney's office to carry out the warrant request for a grand jury investigation and to obtain a court-ordered bank freeze, but prosecutors in that office refused to do so.  The court may take judicial notice of news articles for their existence, but not for the truth of the statements asserted therein.  *See, e.g.*, *Hourani v. Psybersolutions*, 164 F. Supp. 3d 128, 132 n.1 (D.D.C. 2016); *cf. Banks v. Booth*, 459 F. Supp. 3d 143, 149, 154 (D.D.C. 2020) (refusing to consider counsel's assertions during preliminary injunction oral argument absent corroborating record evidence).

Noncompliance' under 2 C.F.R. §§ 200.339–200.343, and in accordance with the APA. The court cannot find that EPA complied with these procedures and regulations based on the current record. Consequently, the court finds that Plaintiffs have shown a substantial likelihood of success on the merits on their APA claims.[5]

### b. **Irreparable Injury**

Plaintiffs have also made a sufficient showing of irreparable harm. To show irreparable harm, the "injury alleged must be 'both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief.'" *Church v. Biden*, 573 F. Supp. 3d 118, 138 (D.D.C. 2021) (quoting *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015)). The "'possibility of irreparable harm' is not enough." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). A plaintiff must demonstrate "a clear and present need for extraordinary equitable relief to prevent harm." *Id.* (citation omitted). "If a party fails to make a sufficient showing of irreparable injury, a court may deny a motion for injunctive relief." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 8 (D.D.C. 2009) (citing *CityFed Fin. Corp. v. Off. Of Thrift Supervision*, 58 F.3d 738, 742 (D.C. Cir. 1995)); *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021) ("[M]ovants are barred from receiving such relief should they fail to establish irreparable injury.") (collecting authorities).

The Supreme Court has held that "[i]ssuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

---

[5] Although the parties brief multiple issues, the court need only find that Plaintiffs are likely to succeed on one of their claims for this factor to weigh in their favor, the court does not address these arguments. *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 27 (D.D.C.), *appeal dismissed*, No. 24-7059, 2025 WL 492257 (D.C. Cir. Feb. 13, 2025).

to such relief." *Winter*, 555 U.S. at 22 (emphasis added) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Based on the current record, the court finds that Plaintiffs satisfy the "high standard for irreparable injury." *Church*, 573 F. Supp. 3d at 138 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Here, the harm is not a possibility—as Plaintiffs have shown, without release of the grant funds, imminent harm is unavoidable. Plaintiffs' financing for their operations and projects all derive from the grant money, which is used to pay employees, pay rent, and fund projects. Moreover, preserving the status quo here is particularly important. If Citibank transfers money out of these accounts, the funds will not be recoverable. In cases involving government expenditures, "once the relevant funds have been obligated, a court cannot reach them in order to award relief." *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994). Any transfer, re-allocation, or re-obligation of these funds would be an irreparable loss.

While ordinary economic injuries are usually insufficient to require injunctive relief, financial harm can "constitute irreparable harm . . . where the loss threatens the very existence of the movant's business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Without access to the grant funds, Plaintiffs have no cash or reserves available to pay their operating expenses, and they have no other committed sources of funding that could replace the grant award. *See* Brafford Decl. ¶¶ 40, 43; Timothy Mayopoulos Decl. ("Mayopoulos Decl.") ¶ 7. Plaintiffs will be unable to finance programs they have launched, and they will have to cease operations.

For example, to date, Plaintiff Climate United has committed $392 million to qualified projects and has launched three financing projects. Brafford Decl. ¶ 44. It has:

- Committed a $31.8 million pre-construction loan to finance 18 solar projects benefiting rural communities in Arkansas. This is the largest commercial solar deployment in Arkansas history and is projected to save over $120 million in energy costs over the project's life and create hundreds of jobs.

- Launched a program to establish affordable leasing options for battery electric heavy-duty trucks to small fleets and independent contractors, which will support an affordable leasing program at the ports of Long Beach and Los Angeles before expanding across the country.
- Committed $63 million in pre-construction financing for the design and development of solar power plants in partnership with Tribal governments and communities in Eastern Oregon and Idaho, bringing access to affordable energy to rural communities and Indigenous people, creating 1,200 jobs, and spurring local economic development.

*Id.* ¶¶ 24–26.

In her declaration, Bafford includes concrete examples of both monetary and non-monetary imminent harms. Specifically:

- Climate United cannot currently access funds to pay its payroll and other expenses related to immediate implementation of its grant workplan. *Id.* ¶ 39.
- Climate United has had to defer compensation for certain employees to preserve its limited cash. *Id.*
- Without a stable source of funding, Climate United will no longer be able to pay its employees and will face having to cut hours and furlough staff. *Id.*
- Climate United imminently risks not being able to pay payroll or health, vision, and dental benefits, life insurance, and disability insurance for its employees. *Id.* ¶ 43.
- Furloughing or laying off staff will eliminate positions that perform critical functions for Climate United, including monitoring the loans that Climate United has already disbursed to funding recipients and the $392 million that it has committed to date. *Id.* ¶ 44.
- Climate United imminently risks not being able to pay rent or insurance for certain offices or to pay third-party contractors who perform necessary tasks such as auditing its financial statements, maintaining its IT security and infrastructure, and providing legal services. *Id.* ¶ 45.
- Continued failure to access the funds would prevent Climate United from meeting its commitments under the loans and awards it has approved and plans to approve, potentially forcing it into breach of its existing agreements. *Id.* ¶¶ 46–48, 50.

As to PFC, the freeze has impacted the organization's ability to carry on day-to-day operations and fulfill its legal obligations. *Power Forward,* TRO Mot. at 28. For example, "the inability of PFC and its Subrecipients to access their NCIF funds impedes their ability to pay their

people." *Id.* at 29. PFC's staff are either employees whose positions are funded by the NCIF award or secondees on loan to PFC under secondment and services agreements. *Id.* PFC's inability "to access funds has placed it at imminent risk of defaulting on contracts with critical vendors—including for financial management, IT, legal, and management consultant services." *Id.* PFC has committed at least $539,000,000 to provide affordable housing support and has other projects that will be detrimentally impacted absent funding. TRO Mot. Hr'g Tr. (March 17) 24:01–25:04.

> As PFC's President and CEO, Timothy Mayopoulos, details:

- PFC has been unable to pay outstanding invoices from contractors for work completed on PFC's behalf and, as a result, PFC is incurring default risk with respect to these contracts. Mayopoulos Decl. ¶ 18.
- These include contracts for legal and management consultant services that are necessary for PFC to administer the grant in compliance with the terms of the Award Agreement and contracts for essential financial management and IT services. *Id.*
- If PFC is not able to make payment on these outstanding invoices, which it cannot do without access to its funds, PFC is at imminent risk of losing these services due to default. *Id.*
- PFC's key contractor, for example, has advised that PFC has until March 17, 2025, to make payment or it may cease providing services. *Id.*
- PFC is also unable to pay contractors to complete, or in some cases to begin, critical work for PFC. This includes the completion of a financial reporting audit and work improve PFC's website that is necessary to help make information available to the public. *Id.* ¶ 19.
- PFC's inability to access its funds threatens its ability to compensate these staff members. PFC owes funds under the secondment and services agreements and is at risk of default under those agreements. *Id.* ¶ 20.

Plaintiffs have made a sufficient preliminary showing that the loss of its grant funding "threatens the very existence of [its] business." *Wis. Gas Co.*, 758 F.2d at 674.

### c. <u>Balance of Equities and the Public Interest</u>

The final two factors—balancing the equities and the public interest—further support granting a TRO. When assessing the equities and public interest, courts "balance the competing

claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Ramirez v. U.S. Immigr. & Customs Enft.*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018). If the movant seeks to enjoin the government, the final two factors merge "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm.*, 831 F.3d 500, 511–512 (D.C. Cir. 2016). Although Plaintiffs seek to enjoin both Citibank and the government, the parties acknowledge that Citibank is caught in the middle of the dispute between Plaintiffs and EPA Defendants. Nonetheless, the court will address both factors.

Because neither Citibank nor EPA will suffer significant harm from a temporary injunction preserving the status quo, the balance of equities support granting a TRO. Citibank previously anticipated disbursing the funds to Plaintiffs. The court merely orders the parties to preserve the status quo—that is, for Citibank to maintain the grant funds in Plaintiffs' respective accounts. As to EPA Defendants, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020) (quoting *R.I.L-R v. Johnson,* 80 F. Supp. 3d 164, 191 (D.D.C. 2015)).

When the court asked EPA to proffer evidence justifying its decision given the terms of the agreement, its only response was to refer to the termination letter, which gave no legal justification for the termination. TRO Mot. Hr'g Tr. (March 12) 18:04–5. While EPA Defendants voice concerns regarding "program integrity," "programmatic fraud, waste, and abuse," and "the absence of adequate oversight and account controls to prevent financial mismanagement, Termination Letter at 1–2, vague and unsubstantiated assertions of fraud are insufficient. *See Am. Foreign Serv. Assoc. v. Trump*, No. 2025 WL 434415, at *2 (D.D.C. Feb. 7, 2025) (finding "no difficulty concluding that the balance of the hardships favors the plaintiffs" when government "had no response—beyond asserting without any record support that USAID writ large was possibly

engaging in 'corruption and fraud'").  On the other side, Plaintiffs face irreparable harm absent a TRO.  By preserving the status quo, the court is not "forcing the government to undo its termination" or allowing "grantees to access billions of dollars in grant funds," as EPA Defendants argue.  Defs.' Opp'n at 25–26.  Preserving the status quo does not make these funds unrecoverable.

The public interest also favors a TRO.  "There is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citing *Pursuing Am.'s Greatness*, 831 F.3d at 511–512).  In contrast, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *Id.* (citation omitted).  Here, temporary relief ensures that the government abides by the statutes and regulations governing the NCIF, which serves the public interest.  Therefore, the final two factors warrant the narrow TRO issued here.

## IV.    CONCLUSION

For these reasons, it is hereby ORDERED that Plaintiffs' Motions for a Temporary Restraining Order are GRANTED in part and DENIED in part.  An Order will accompany this Memorandum Opinion.


Date: March 18, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge